**Leoncio Anibal DEL CID, Plaintiffs,**

v.

**BELOIT CORPORATION, Defendant and Third–Party Plaintiff,**

v.

**MAJESTIC MOLDED PRODUCTS, INC., Third–Party Defendant.**

No. CV–92–4423 (DGT).

United States District Court, E.D. New York.

Sept. 22, 1995.

John V. Mirman, Mineola, NY, for Plaintiff.

Kenny & Stearns, New York City, for Defendant.

William M. Kimball, New York City, for Third–Party Defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

In this strict products liability bench trial, plaintiff, Leoncio Anibal Del Cid ("Del Cid"), seeks to recover damages for the serious injuries he sustained when he attempted to free a chain hoist which had become entangled on an air filter of a plastic injection molding machine designed and manufactured by defendant, Beloit Corporation ("Beloit"). Del Cid claims his injuries were proximately caused by a design defect in the machine— the failure to equip the machine with an appropriate device to guard a shear point on the top of the machine. Beloit claims that the machine was not defectively designed as it complied with all applicable industry safety standards for the guarding of plastic injection molding machines. Further, Beloit argues that Del Cid's actions were unforeseeable, and, in any event, his injuries were proximately caused by his negligence when he climbed on top of the machine to reposition the chain hoist. Finally, Beloit argues that should it be found liable to Del Cid it is entitled to contribution from Del Cid's employer—third-party defendant, Majestic Molded Products, Inc. ("Majestic"). Beloit claims Majestic failed to train Del Cid properly on how to reposition an entangled chain hoist, and also failed to equip the chain hoist with a chain container which would have prevented the chain from becoming entangled with the air filter.

### Background

At the time of trial, Del Cid was a 45 years old Guatemalan citizen who had been residing in New York for ten years (Tr. 14). Prior to coming to the United States, Del Cid received a secondary school degree in electrical sciences and studied architecture in college for six months (Tr. 14). Del Cid began working at the age of 14 while still attending school (Tr. 14). At the age of 16 and one-half, Del Cid started a business making metal doors and windows (Tr. 15). In this business, Del Cid employed as many as nine workers whom he personally trained and supervised, and for whose safety he felt responsible (Tr. 444). Del Cid left Guatemala in May of 1985 because his business was suffering and he was no longer able to support his wife and three children (Tr. 16). Del Cid speaks only Spanish, although he has a limited ability to read and write in English (Tr. 67, 398). Prior to his injury, Del Cid was

quite athletic (Tr. 6, 16). Del Cid testified that he enjoyed playing soccer and swimming, and even ran marathons (Tr. 16).

Beloit is a Wisconsin corporation which is engaged in the business of designing and manufacturing various types of industrial machines used to fabricate finished products. Compl. ¶ 3; Ans. ¶ 3. In 1977, Beloit's Jones Division manufactured a 600–ton plastic injection molding machine for Majestic (Tr. 300–03). This type of machine operates by pumping heated plastic into a mold made of two platens, each of which weighs anywhere from one to three thousand pounds (Tr. 256). One platen is stationary and the other moves horizontally by means of a hydraulic system to open and close the mold (Tr. 97–98). After the mold is closed, liquified plastic is injected into the mold and the product is formed (Tr. 98). Once the plastic product is formed, the moveable platen returns to its original position and the finished product is either automatically ejected from the mold or manually removed by a machine operator (Tr. 97–98). Beloit manufactured 24 machines of this design in the late–1970s (Tr. 302).

Majestic is a New York Corporation with its principal place of business in Holbrook, New York (Tr. 252).[1] Majestic was engaged in the business of manufacturing various finished plastic products using plastic injection molding machines (Tr. 6, 16). At the time of Del Cid's injury, Majestic utilized 37 plastic injection molding machines in its Holbrook facility (Tr. 254).

Shortly after arriving in the United States on May 26, 1985, Del Cid began working for Majestic (Tr. 16). At first, Del Cid worked as a hopperman—loading the hopper of each molding machine at least once per hour (Tr. 17, 262–63). In so doing, Del Cid would carry a 50– or 55–pound bag of plastic pellets up a large platform ladder, open the bag with a blade, pour the pellets into the hopper, and then descend the ladder and repeat the process on another machine (Tr. 74, 259, 261). In addition to being a hopperman, Del Cid occasionally would work overtime assisting the machine operators by keeping their tables clean, trimming the finished products, and packing the product into boxes (Tr. 17). Del Cid continued working for Majestic in these capacities for approximately six weeks (Tr. 16–17).

After his initial term of employment with Majestic, Del Cid worked for six years in construction, for another plastics factory, and as a housekeeper (Tr. 18–19). Del Cid began working for Majestic again in January of 1992 as a machine operator (Tr. 21, 66). As a machine operator, Del Cid was responsible for every aspect of operating a plastic injection molding machine—monitoring the molding process, removing the product, trimming the product, and packing the finished product into boxes (Tr. 72). In addition to being a machine operator, Del Cid performed a number of other tasks for Majestic, including mold setting, assisting other machine operators and general maintenance (Tr. 21, 274).

On June 16, 1992, Del Cid's right leg was severely injured while he attempted to reposition a chain hoist[2] which had become entangled on an air filter atop the oil reservoir of Majestic's machine number 30 (Tr. 21–42). On that day, Del Cid was working as a mold setter/mechanic and was responsible for, among other things, changing the platens on each molding machine (Tr. 274). In addition, Del Cid had been assisting another employee making boxes (Tr. 403). Immediately prior to his injury, Del Cid was asked by his supervisor, Alex Rodriguez, to move a chain hoist from a position over machine number 31 to machine number 29 (Tr. 34, 407).

---

**1.** Since Del Cid's injury, Majestic filed for bankruptcy for reasons unrelated to the accident, and was dissolved (Tr. 218).

**2.** A chain hoist is a device used to raise, move and lower heavy pieces of machinery or material—in Majestic's case, the platens used to form the molds. The hoist moves along a stationary horizontal monorail which is attached to the ceiling of the factory. The hoist is comprised of a block—a set of pulleys—a hand chain and a load chain (Tr. 341). The hand chain is a continuous loop of chain used to operate the hoist (Tr. 342). The load chain is a length of chain at the end of which a hook is attached (Tr. 342). During operation, the hook is attached to the platen, which is then raised, moved into position, and lowered by manipulating the hand chain (Tr. 342).

In order to move the chain hoist as requested, Del Cid pulled the hand chain in the direction of machine number 29 while walking parallel to the monorail, see *supra* note 2 (Tr. 408, 421–22). After the hoist had passed over machine number 30, it slid back in the other direction and the load chain became entangled on an air filter atop the machine's oil reservoir (Tr. 101, 416–417). At first, Del Cid tried to free the load chain by shaking the hand chain for ten to fifteen seconds (Tr. 421, 426). When this did not work, Del Cid, who was quite agile even at 42 years of age (Tr. 6), climbed onto the machine operator's table, where he again attempted to free the hoist by shaking the hand chain (Tr. 415). In this, he was also unsuccessful. Del Cid then continued to climb, this time onto the plastic injection molding machine which was still being operated, in an effort to free the load chain by hand (Tr. 426–29).

After Del Cid ascended the machine, he placed both feet on a two-inch-wide angle bracket over the machine's point of operation (Tr. 24, 430–32)—"the mold area ... where the work gets done" (Tr. 105). While Del Cid was balancing himself on the angle bracket, he looked up at the air filter and attempted to free the load chain with both hands (Tr. 24, 434). As he attempted to free the hoist, Del Cid's right foot slipped off the angle bracket and came to rest on a tie rod (Tr. 24, 434)—a metal rod which connects the two halves of the machine (Tr. 33). Almost immediately thereafter, as the machine was cycling, the mechanical stop bar[3] crushed Del Cid's right leg and he was severely injured (Tr. 24, 437).

As a result, Del Cid's right leg was amputated below the knee (Tr. 2, 48). Shortly after his surgery, Del Cid was fitted with a cosmetic prosthesis (Tr. 51). In time, Del Cid was fitted with a functional prosthesis and received physical therapy so he could learn how to walk correctly (Tr. 52). However, approximately four months after he was fitted with the first functional prosthesis problems arose and Del Cid began to experience pain in his right leg and back (Tr. 54, 57). As a result, Del Cid was fitted with a second functional prosthesis (Tr. 291–93). It is expected that Del Cid's prosthesis will need to be replaced every three to five years over his lifetime (Tr. 295). In addition, Del Cid began seeing a chiropractor three times per week to alleviate his leg and back pain, and was still doing so at the time of the trial (Tr. 55). Obviously, Del Cid will no longer be able to participate in athletics as he had in the past.

### Discussion

■ Under New York strict products liability law, a plaintiff may recover for injuries sustained as a result of a design defect where "the product 'was not reasonably safe and [ ] the design defect was a substantial factor in causing [the] injury.' " *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 905 (2d Cir. 1991) (*quoting Voss v. Black & Decker Manufacturing Co.*, 59 N.Y.2d 102, 107, 450 N.E.2d 204, 208, 463 N.Y.S.2d 398, 402 (1983)). To recover on such a claim, a plaintiff must demonstrate that the manufacturer failed "to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which [it] was intended ... as well as an unintended yet reasonably foreseeable use," *Micallef v. Miehle Co., Division of Miehle–Goss Dexter, Inc.*, 39 N.Y.2d 376, 385, 348 N.E.2d 571, 577, 384 N.Y.S.2d 115, 121 (1976), and that the design defect was the proximate cause of his or her injuries. *Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir.1991) (*citing Voss, supra*, 59 N.Y.2d at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204).

■ The determination of whether a product presents an unreasonable risk of harm involves the balancing of the foreseeability and gravity of the harm with the burden of preventing it. *Micallef, supra*, 39 N.Y.2d at 385, 348 N.E.2d at 577, 384 N.Y.S.2d at 121. Although the foreseeability of the misuse of a product is relevant to the issue of whether the manufacturer adequately designed the product to guard against the risk, the precise chain of events preceding

---

**3.** A mechanical stop bar is a horizontal metal bar that moves back and forth as the machine cycles and prevents the platens from closing if the other two safety devices fail (Tr. 103–04).

the misuse need not have been foreseen to require the manufacturer to guard against the consequences of that misuse. *Parsons, supra,* 929 F.2d at 905–06. Rather, "foreseeability includes the probability of the occurrence of a general type of risk involving the loss, rather than the probability of the occurrence of the precise chain of events preceding the loss ..." *Tucci v. Bossert,* 53 A.D.2d 291, 293, 385 N.Y.S.2d 328, 331 (2d Dep't 1976).

Based on the applicable New York law, this case presents a number of issues for resolution: (1) was the injection molding machine defectively designed, i.e., whether it presented an unreasonable risk of harm to Del Cid?; (2) what role, if any, did Majestic play in causing the injury?; (3)(a) was the design defect a proximate cause of Del Cid's injury, and (b) if Majestic did play a role in causing the injury, was it also a proximate cause of the injury?; (4) if both Beloit and Majestic were at fault and the proximate cause of Del Cid's injury, what are the degrees of fault properly attributable to each?; (5) what, if any, are the damages to which Del Cid is entitled?; and (6)(a) did Del Cid play a role in causing the injury, and (b) if so, to what extent should his recovery be reduced by his comparative fault?

## 1. Design Defect—Unreasonable Risk of Harm

■ As stated above, whether a manufacturer designed an unreasonably unsafe product involves a balancing of the foreseeability and gravity of the harm created by the product with the feasibility of a more safe design. *See, e.g., Micallef, supra.* Only where the foreseeability and gravity of the harm is so slight, or where the "the product would be unworkable [were] the alleged missing feature added, or would be so expensive as to be priced out of the market," will the manufacturer be able to escape liability for a defectively designed product. *Id.,* 39 N.Y.2d at 386, 348 N.E.2d at 578, 384 N.Y.S.2d at 121.

## a. Design Defect—Applicable Industry Safety Standards

■ To determine whether the plastic injection molding machine presented an unreasonable risk of harm to Del Cid, it is helpful to examine the industry safety standards applicable to the design and manufacture of such machines. Such standards were promulgated "to eliminate injuries to personnel associated with machine activity." ANSI B151.1–1976, Foreword. Compliance or lack of compliance with industry safety standards, however, is not dispositive of the issue of a design defect, see *Parsons, supra,* 929 F.2d at 906; *DeRosa v. Remington Arms Co., Inc.,* 509 F.Supp. 762, 768 (E.D.N.Y.1981) (Weinstein, J.), and other evidence concerning the design and safety of the machine may be considered. *Parsons, supra,* 929 F.2d at 906.

At trial there was much discussion on the standards applicable to the guarding of plastic injection molding machines. Although both Del Cid's and Beloit's experts disagreed as to which standard applied to the case, both agreed that the most appropriate standards were promulgated by the American National Standards Institute, Inc. ("ANSI").[4] ANSI standards are relied upon by the manufacturers of machinery and by experts in various fields to conduct evaluations of the safety of machinery and processes (Tr. 95). Here, two standards were discussed—the Safety Standard for Mechanical Power Transmission Apparatus ("General Standard"), and the Safety Requirements for the Construction, Care and Use of Horizontal Injection Molding Machines ("Specific Standard").

Section 9 of the General Standard is entitled "Requirements for Guarding by Location." ANSI B15.1–1972. That section provides that "[e]quipment guarded by location shall by remoteness from the working areas remove the foreseeable risk of contact by persons." *Id.* at § 9.1. More specifically, § 9.1.1 of the General Standard provides

4. ANSI is a not-for-profit body comprised of representatives from manufacturers, employers, insurers, government agencies, and trade and professional organizations all of which have an interest in the standardization of safety require-ments for the construction, care and use of various types of industrial machinery and processes. The specific standards are promulgated by different committees and are reached by consensus (Tr. 94)

that, "[t]o be guarded by location or position any moving part shall be at least 96 inches above the walkway, platform or work-space. Where the equipment has in-running nips, shear points or moving projections, it shall be a minimum of 108 inches above the pertinent floor, platform, or working level." *Id.* at § 9.1.1.

Section 4.3 of the Specific Standard is entitled "General Guarding (Other than Point-of-Operation Guarding)." ANSI B151.1–1976. That section requires, among other things, the use of rear, fixed, and top guards on areas where certain hazards exist—a condition in the machinery which has the potential to cause injury or damage to property (Tr. 111). *Id.* at §§ 4.3.1–4.3.3. More specifically, § 4.3.2, entitled "Fixed Guards," requires that "[f]ixed guards shall be provided over areas where pinching or shearing hazards exist." *Id.* Further, § 4.3.3, entitled "Top Guard," requires that "[a] top guard shall be installed where it would be possible for an operator standing on the floor to reach over the top of the safety gate." *Id.*

Del Cid's expert, Thomas Cocchiola, opined that both § 9.1.1 of the General Standard and § 4.3.2 of the Specific Standard applied to the plastic injection molding machine involved in Del Cid's injury (Tr. 116–30).[5] Cocchiola reasoned that as the mechanical stop bar created a hazard called a pinch or shear point which was only 91 inches above the floor level, this hazard was not guarded by location pursuant to § 9.1.1, and, therefore, some other form of guard was required (Tr. 116–120).[6] Further, Cocchiola stated that as the shearing hazard existed, § 4.3.2 of the Specific Standard required that a fixed guard be provided over the area where Del Cid was injured (Tr. 118–20).

Beloit's expert, Dr. Butler, rejected Cocchiola's contention that § 9.1.1 of the General Standard applied because, "when there are two standards, the one that is specific super-sedes the other" (Tr. 202). In other words, as the Specific Standards are particular to the "... construction, care, and use of *horizontal injection molding machines,*" they supersede the General Standards applicable to "Mechanical Power Transmission Apparatus." (Emphasis added). Further, although Dr. Butler's testimony on this point was not clear—and perhaps contradicted his principal point that the General Standard was not applicable to this case—he seemed to argue that the General Standard was also complied with because "a person would not normally be in [the] location [where Del Cid was injured]." The area was therefore, guarded by location, and no further guard was necessary (Tr. 194).

With respect to his main point, Dr. Butler explained that § 4.3.2 of the Specific Standard, which requires a fixed guard to be provided over areas where pinching or shearing hazards exists, was not applicable to the facts of this case. Butler determined that as it was unforeseeable that an employee would have access to the shear point under normal circumstances, the shear point was, therefore, not a "hazard" within the meaning of hazard analysis (Tr. 233). Accordingly, Butler opined that § 4.3.2, by its very terms, did not require the presence of a fixed guard over the area. Dr. Butler also explained that as the illustrations accompanying § 4.3.2 only depicted fixed guards on the side, rather than on the top, of an injection molding machine, § 4.3.2 did not require the presence of a fixed guard over the area in question (Tr. 205).

In Dr. Butler's view, the only applicable section was Specific Standard § 4.3.3—the Top Guard provision—(Tr. 204). Dr. Butler opined that because § 4.3.3 only required a top guard "where it would be possible for an operator standing on the floor to reach over the top of the safety gate," no guard was required in this case as a machine operator

---

5. Cocchiola stated that § 4.3.3 of the Specific Standard did not apply because "under normal circumstances, [a person standing on the floor] could not reach over the safety gate and into the [point of operation] of the machine" (Tr. 156). It would appear that Cocchiola's interpretation of § 4.3.3 is, however, incorrect. Section 4.3.3 only requires the possibility that a machine oper-ator could reach over the top of the safety gate, *not* into the point of operation of the machine. *See* ANSI B151.1–1976, § 4.3.3.

6. Throughout this Memorandum and Order the terms pinch point and shear point will be used to indicate the same hazard.

could not do so (Tr. 194–95, 205). In all, it was Dr. Butler's opinion that the injection molding machine in question was properly guarded (Tr. 199).

■ After careful evaluation of the expert testimony and ANSI safety standards, it is clear that the design of the plastic injection molding machine in question did not comply with those standards. Dr. Butler's argument that the General Standard did not apply to this case, or that it was complied with, must be rejected. First, there is no conflict between the two Standards. Both can easily be applied. Second, there is nothing either in the language or format of the Standards that supports his assertion that the Specific Standard controls the General Standard. Third, despite Dr. Butler's opinion that under normal circumstances a machine operator could not reach into the point of operation of the machine, and, therefore, the shear point was guarded by location and § 9.1.1 of the General Standard did not apply, the shear point in question was not guarded by location. By its explicit terms, § 9.1.1 states that to be guarded by location, any shear point must be a minimum of 108 inches (9 feet) above the pertinent floor, platform, or working level. At trial, it was undisputed that the shear point in question was less than 108 inches above such level. Therefore, based on the explicit requirements of the General Standard, the shear point was not guarded by location and some other type of guard was required.

Nevertheless, even accepting Dr. Butler's contention that the General Standard is not applicable and the Specific Standard controls this case (Tr. 194), there is ample evidence from which the determination can be made that both § 4.3.2 and § 4.3.3 required some form of guard to be in place over the pinch point in question.

■ Dr. Butler's opinion that § 4.3.2 does not apply to this case because the shear point in question did not present a hazard must be rejected. As stated earlier, § 4.3.2 requires a fixed guard to be present, where "pinching and shearing hazards exist." ANSI B151.1–1976. First, despite his ultimate opinion to the contrary, Dr. Butler admitted on cross-examination that the shear point in question did create a hazard (Tr. 225, 245).

Second, Dr. Butler's opinion that § 4.3.2 is not applicable to this case is based on an inaccurate evaluation of the accident site as it existed on the day Del Cid was injured. At trial it was claimed that Dr. Butler, who is six feet, five inches tall (Tr. 191), could not reach over the top of the safety gate and to the shear point while standing on the factory floor (Tr. 155–56, 191). Thus, it was Dr. Butler's opinion that the shear point was not a hazard. However, Dr. Butler's attempt to reach the shear point was performed after the machine operator's platform had been removed from in front of the machine (Tr. 239). At trial it was established that the operator's platform was at least ten and three-quarters inches in height (Tr. 154, 240), and was in front of the machine at all times (Tr. 277–80). In addition, it was established that the vertical distance to the top of the safety gate was roughly seven feet, five inches from the floor (Tr. 195), and the horizontal distance from the safety gate to the pinch point was about twelve inches (Tr. 154). With the operator's platform in place, the vertical distance to the top of the safety gate becomes six feet, seven inches and the total linear distance to the pinch point becomes at most seven feet, seven inches. The height of the operator's platform, therefore, makes it very possible that a machine operator or other factory worker of normal height could reach over the top of the safety gate, or a taller machine operator or factory worker could reach over the safety gate and to the shear point in question (Tr. 155–56).

Therefore, as Dr. Butler's opinion was based on an unreliable factual predicate, it is entitled to less weight in the resolution of the design defect issue. *See, e.g.,* Fed.R.Evid. 703; *Christophersen v. Allied–Signal Corporation,* 939 F.2d 1106, 1114 (5th Cir.1991) (court must reject opinions which are based on unreliable factual foundation), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992); *United States v. Davis,* 772 F.2d 1339, 1344 (7th Cir.1985) (same), *cert. denied,* 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1986); *Kupster Realty Corp. v. State of New York,* 93 Misc.2d 843, 859–63,

404 N.Y.S.2d 225, 236–39 (Claims Ct.1978). Accordingly, the shear point in question did create a hazard, and, therefore, § 4.3.2 of the Specific Standard required some form of fixed guard to be in place.

Similarly, Dr. Butler's opinion that § 4.3.2 of the Specific Standard is not applicable because the illustrations accompanying that section only depict fixed guards on the side of an injection molding machine, and not the top, is not persuasive. At trial it was established that the illustrations accompanying the ANSI standards were only meant as examples of how the guards could be applied, and were not meant as part of the standards themselves (Tr. 214). Moreover, as mentioned above, § 4.3.2 explicitly states that "[f]ixed guards *shall be provided* over areas where pinching or shearing hazards exist" (emphasis added). Therefore, as a shearing hazard existed, the explicit terms of § 4.3.2 required that a fixed guard be provided over that area, and, as no guard was provided, the machine did not comply with § 4.3.2 of the Specific Standard.[7]

■ Despite Dr. Butler's testimony that only § 4.3.3 of the Specific Standard applied to this case, and that it was concededly complied with, there is nothing in the Standards to indicate that only one provision of the Specific Standard is applicable to a given hazard. In fact, the opposite is the only reasonable inference which can be drawn from the language of the two specific provisions. Thus, although § 4.3.3 explicitly states that "[a] top guard shall be installed where it would be possible for an operator standing on the floor to reach over the top of the safety gate," it goes on to state that "[i]f a fixed guard is used, an electrical interlock is not required." Clearly then, § 4.3.3 of the Specific Standard contemplates the use of at least two types of guards for a single hazard, fixed or top. In other words, a fixed guard can also be used in place of a top guard, or vice versa. Accordingly, § 4.3.3 in no way precludes the applicability of § 4.3.2 to guard a shearing hazard which is on the top of a plastic injection molding machine, and Dr. Butler's contention must be rejected.

■ Even if Dr. Butler's opinion that § 4.3.3 of the Specific Standard was the only standard applicable to the facts of this case is correct, his contention that the design of the molding machine in question complied with that standard must be rejected. As stated earlier, Dr. Butler opined that § 4.3.3 was complied with "because it's not possible for an operator standing on the floor to reach over the top of the safety gate *to get to this location*"—the shear point—and, therefore, a top guard was not required (Tr. 204–05).

7. On the third day of trial, counsel for Beloit introduced a New York State regulation entitled "Plastic molding machinery—general provisions for all machines," which was promulgated by the Department of Labor's Board of Standards and Appeals (Tr. 215). *See* 12 NYCRR § 19.33 (1971). The regulation provides, "[s]tationary barrier guards are not required for any danger zone on the machine which is guarded by location." 12 NYCRR § 19.33(g) (1971). Although this state regulation was not referred to in any of the pre-trial documents, nor was it discussed by either expert at trial, the Court can take judicial notice of the regulation (Tr. 246). *See, e.g., Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 742 n. 4, 96 S.Ct. 2337, 2343 n. 4, 49 L.Ed.2d 179 (1976); *Lamar v. Micou,* 114 U.S. 218, 223, 5 S.Ct. 857, 859, 29 L.Ed. 94 (1885). Counsel argued that since the "danger zone" where Del Cid was injured was guarded by location, no other guard was necessary, and, therefore, the machine was not defectively designed. In addition, counsel argued that because the Occupational Safety and Health Administration ("OSHA") did not issue a violation to Majes-

tic for failing to guard the top of the machine, Beloit should not be held liable for Del Cid's injuries (Tr. 267, 481–485).

Counsel's arguments are misplaced for three reasons. First, the regulation in question does not define what guarded by location means. Second, as stated earlier, according to the ANSI § 9.1.1 definition for guarded by location—"[t]o be guarded by location or position any ... shear point[] ... shall be a minimum of 108 inches above the pertinent floor, platform, or working level"—the area in question was not guarded by location. Third, even if the area was guarded by location and the machine's design complied with the New York State and OSHA regulations, compliance or lack of compliance with such regulations is not dispositive of the issue of a design defect, but is merely some evidence of such a defect. *See Cappellini v. McCabe Powers Body Company,* 713 F.2d 1, 4–5 (2d Cir.1984); *Montalvo v. Rheem Textile Systems, Inc.,* No. 86–9501, 1991 WL 52777, *3 (S.D.N.Y. Apr. 4, 1991); *Long v. Forest–Fehlhaber,* 55 N.Y.2d 154, 159, 433 N.E.2d 115, 117, 448 N.Y.S.2d 132, 134 (1982); *Rivera v. MKB Industries, Inc.,* 149

Dr. Butler based this opinion on his alleged inability to reach over the top of the safety gate and to the shear point during his physical examination of the machine. Despite Dr. Butler's opinion and interpretation of § 4.3.3, the explicit language of the standard clearly requires a top guard where "it would be possible for an operator standing on the floor to reach over the top of the safety gate." Thus, as the standard requires a top guard only where it is possible for a machine operator to reach over the safety gate, it is irrelevant whether the machine operator can reach over the safety gate *and* get to the shear point. As stated earlier, it was undisputed that the top of the safety gate was 91 inches off the floor. Even a person much shorter than Dr. Butler can reach over 91 inches. Clearly then, as it is possible for a machine operator of normal height to reach over the top of the safety gate while standing on the floor, the design of the plastic injection molding machine in question did not comply with § 4.3.3 of the Specific Standard.[8]

In sum, based on the evidence at trial, it is clear that the design of the plastic injection molding machine in question did not comply with § 9.1.1 of the General Standard or §§ 4.3.2 or 4.3.3 of the Specific Standard. Therefore, the plastic injection molding machine was defectively designed.

### b. Feasibility of a More Safe Design

█ Del Cid would not be entitled to recover for his injuries unless he could prove that he was exposed to a reasonably foreseeable and grievous risk of harm and that a safer design for the machine was feasible. *See Micallef, supra.* The evidence at trial indicated that a safer design of the injection molding machine was quite feasible.

Cocchiola testified that there were at least three alternatives through which the machine could have been made safer. First, the mechanical stop bar could have been extended several feet (Tr. 130). By extending the stop bar several feet, the end of the bar would never have passed the side of the oil reser-

voir, thereby eliminating the shear point (Tr. 130–32). Second, a type of fixed guard called a tube lining could have been affixed around the stop bar, which would also have eliminated the shear point (Tr. 131). In fact, a tube lining was in place over the opposite end of the stop bar (Tr. 131–32). Third, any number of other fixed or top guards could have been used to eliminate or guard against the shear point (Tr. 132). According to Cocchiola, each of the three alternatives would have cost no more than a few hundred dollars and would not have affected the function or productivity of the machine (Tr. 133). Beloit introduced no evidence to contradict these assertions or to show that, so equipped, the machine would have been priced out of the market. *See Micallef, supra,* 39 N.Y.2d at 386, 348 N.E.2d at 577, 384 N.Y.S.2d at 121.

### c. Foreseeability and Gravity of Harm

█ In order to recover for an alleged design defect, a plaintiff must establish that he or she used the product in the manner for which it was intended, or for a reasonably foreseeable yet unintended use. *See Micallef, supra.* At trial, it was conceded that Del Cid used the machine in an unintended manner. Therefore, it was necessary for Del Cid to establish that his unintended use of the machine was reasonably foreseeable. This issue was hotly disputed at trial. Beloit argued that, as a matter of law, it was unforeseeable that a factory worker would negligently misuse a plastic injection molding machine by climbing on top of it to free an entangled chain hoist, and, therefore, it should not be held liable for Del Cid's injuries (Tr. 489–94).

█ Del Cid does not concede, nor does this Court find, that his action in climbing on top of the molding machine was either negligent or unforeseeable as a matter of law. As with proximate cause, negligence and foreseeability normally are questions of fact, and are rarely suitable for determination as a matter of law. *See, e.g., Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 314–15,

A.D.2d 676, 540 N.Y.S.2d 316, 318 (2d Dep't 1989).

**8.** This particular example of how § 4.3.3 of the Specific Standard was violated may appear to be of no consequence to the specific facts of this

case as it is not the proximate cause for Del Cid's injury. Nevertheless, regardless of the precise way § 4.3.3 was violated, the fact remains—had a top guard been in place Del Cid would not have been injured.

414 N.E.2d 666, 670, 434 N.Y.S.2d 166, 169 (1980); *Rotz v. City of New York,* 143 A.D.2d 301, 304, 532 N.Y.S.2d 245, 247 (1st Dep't 1988). Moreover, even if Del Cid's actions were negligent, the negligent and unintended acts of employees are often foreseeable, and are frequently taken into account in the design and manufacture of machinery. *See, e.g., Hall v. E.I. du Pont De Nemours & Co., Inc.,* 345 F.Supp. 353, 367–68 (E.D.N.Y.1972); *Quadrozzi v. Norcem, Inc.,* 125 A.D.2d 559, 560, 509 N.Y.S.2d 835, 836 (2d Dep't 1986).

Thus, Beloit misses the point in arguing that because Del Cid's specific misuse of the injection molding machine—climbing atop the machine to free the entangled chain hoist—was unforeseeable, the machine was not defectively designed, and it should not be held liable for Del Cid's injuries. As stated above, although foreseeability is an issue in design defect cases, all that is required is the foreseeability of the general type of risk to which the user was exposed; the precise misuse of the product need not have been foreseen. *Parsons, supra,* 929 F.2d at 905; *Grant v. Westinghouse Electric Corp.,* 877 F.Supp. 806, 818–19 (E.D.N.Y.1995); *Derdiarian, supra.* As Professor Aaron D. Twerski, Co–Reporter of the Restatement of the Law (Third) Torts: Products Liability, has noted, the inquiry in design defect cases should not be limited to whether the *particular* misuse was foreseeable, but should:

> legitimately encompass the total design of the product and *other risks* as well. These risks must then be weighed against the cost of taking precautionary measures to prevent the product from causing injury.

Twerski, "The Many Faces of Misuse: An Inquiry Into the Emerging Doctrine of Comparative Causation," 29 Mercer L.Rev. 403, 418 (1978) (emphasis added).[9] *See also* Wade, "Strict Tort Liability of Manufacturers," 19 S.W.L.J. 5, 17 (1965); Keeton, "Product Liability and the Meaning of Defect", 5 St. Mary's L.J. 30 (1974); *Hoppe v. Midwest Conveyor Co.,* 485 F.2d 1196, 1202 (8th Cir.1973); *Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076 (5th Cir.1973).

Here, even if Del Cid's specific misuse of the machine was unforeseeable, the general nature of the risk to which he was exposed—coming into contact with the unguarded pinch point—was reasonably foreseeable.

The evidence adduced at trial showed that there were normal situations in which workers would be exposed to the unguarded pinch point on the top of the machine, even while the machine would be turned on (Tr. 120–29, 202). For example, Del Cid's expert, Cocchiola, testified that according to the machine's operating manual the preventive maintenance procedures of checking the oil level in the reservoir and checking for leaks in the hydraulic system both should be accomplished while the machine is turned on (Tr. 126–27, 464–66). Although these procedures should be performed with the use of a ladder (Tr. 128), it is not unforeseeable that while so doing an employee could slip off the ladder and fall into the unguarded area on top of the machine. Even Beloit's expert, Dr. Thomas Butler, testified that "[i]f it's accessible by a person under normal circumstances, a person walking by the machine, *doing something else, maybe tripping and falling into it …*" some sort of guard would be required (Tr. 202–03; emphasis added). According to a reasonable interpretation of Butler's testimony, even if Del Cid had used a ladder to free the chain hoist, a normal circumstance and proper procedure according to Beloit, it would not be unforeseeable that he could have fallen off the ladder and into the machine, and could have been injured in a similar or worse manner (Tr. 495). Further, some areas near the top of the machine are not even accessible from a ladder. Therefore, it was reasonably foreseeable that an employee would seek access to these areas by climbing on top of the machine and could then be injured by falling into the unguarded area in question.

If there were any doubt on the issue of the foreseeability of this accident, it was eliminated by Beloit's providing a specific warning against standing on the machine during its operation. Under the practice called "hazard

---

**9.** Actually, Professor Twerski believes the inquiry into the foreseeability of misuse in a design defect case is more appropriately addressed in the proximate cause and apportionment of fault analyses. *Id.* at 417–34.

analysis"—the determination and prevention of known hazards from causing injuries to workers or damage to property—there are three methods used to minimize or prevent *reasonably foreseeable* injuries or damage—eliminate, guard, or warn against any existing hazards, whether created by intended or unintended uses of the product (Tr. 112, 129). Here, Beloit chose to employ the least effective of these methods to guard against this hazard—they affixed a specific warning on the machine which warned workers against standing on the machine during its operation (Tr. 129). Although the act of standing on top of the machine during its operation may not have been an intended use of the machine, if it were not reasonably foreseeable that such an act would occur, the warning would not have been necessary and most likely would not have been posted (Tr. 129–30, 146–47). *See Bickram v. Case I.H.,* 712 F.Supp. 18, 21 (E.D.N.Y.1989) (McLaughlin, J.) ("As a general rule, warnings are [used] to alert the user of a product to avoid certain uses that appear normal and reasonable but that may, in certain instances, be dangerous"). Therefore, although Del Cid did not use a ladder to free the entangled chain hoist, and his actions were a misuse of the machine, he was exposed to a reasonably foreseeable risk which Beloit had anticipated might occur (Tr. 127, 146–48, 495–86).

Similarly, the gravity of harm to which Del Cid was exposed was great. The area where Del Cid was injured was immediately above the point of operation of the machine. As such, this area brought together all of the working parts of the machine in order to accomplish its designed task. As mentioned above, the area in question houses the platens which comprised the mold, each of which weighed between one and three thousand pounds. The platens are pressed to-

gether by a powerful hydraulic system. In addition, the area houses other moving parts, including the mechanical stop bar which crushed Del Cid's leg. Except for the top of the machine, this area was completely guarded to prevent workers from coming into contact with the machinery involved in the dangerous process of molding plastic products. Clearly, the potential of this area to cause serious and permanent injury cannot be disputed.

In sum, although the manner in which Del Cid's injury occurred might not have been specifically foreseen by Beloit, it was certainly foreseeable that an employee would go on top of the machine and, once on top of the machine, might slip and suffer injury from the unprotected shear point. Balancing this possibility with the grave risk of serious injury that could occur, and the minimal cost of making the machine safer, establishes a clear defect in the machine's design.

## 2. Third–Party Claims—Majestic's Breach of Chain Container Safety Standard

█ In addition to the evidence concerning the defective design of the molding machine, there was substantial evidence adduced at trial which indicated that Majestic breached an American National Standard for the use of the chain hoist involved in Del Cid's accident (Tr. 325–52).[10] *See* ASME/ANSI B30.16–1993, § I. Beloit's expert, Andrew Toth, vice chairman of the committee which promulgated the standards, testified that the use of the chain hoist involved in Del Cid's injury violated the standards applicable to the construction, installation, operation, inspection and maintenance of overhead hoists (Tr. 338).[11] These standards were

10. These standards are promulgated by a committee of the American Society of Mechanical Engineers ("ASME") (Tr. 328). The committee is comprised of 35 representatives of manufacturers and users of overhead handling equipment, the military, insurance carriers and state and national agencies, e.g., Occupational Safety and Health Administration (Tr. 328). Before a standard is promulgated, the committee votes on the various recommendations of its members; the proposed standards are then submitted for

national consensus, and finally there is public review of the proposed standards (Tr. 329).

11. Counsel for Majestic argued that these standards were not applicable to Majestic, which did not manufacture or install the chain hoist in question (Tr. 329–30, 337). However, by their own terms, the standards are applicable to the "construction, installation, *operation*, inspection and maintenance" of such devices. ASME/ANSI B30.16–1993, § I (Scope) (emphasis added). Further, the standards were designed to "provide

promulgated to guard against and minimize injury to workers, and to provide guidance to owners, employers, supervisors, and employees on the use of such hoists. *See* ASME/ANSI B30.16–1993, § II(a), (b). Specifically, Toth opined that the failure to equip the chain hoist with a chain container violated § 16.1.3.3(g) of the standard (Tr. 340). Section 16.1.3.3(g) requires a chain container to be used "where the slack load chain hanging from the hoist may create a hazard to operations or personnel." A chain container prevents the slack load chain from becoming entangled with any machinery or from coming in contact with personnel (Tr. 332–33). According to Toth, if Majestic's chain hoist had been equipped with such a container, the slack load chain would not have become entangled on the air filter of machine number 30 and the accident most likely would not have happened (Tr. 340–41).

Further, Del Cid testified that he witnessed chain hoists get stuck on the tops of Majestic's plastic injection molding machines at least six times (Tr. 35). In addition, Del Cid testified that on at least one other occasion, an employee climbed onto an operating injection molding machine to free an entangled chain hoist and was injured (Tr. 35–37, 438). Beloit also claimed that Majestic failed to train Del Cid properly on how operate the chain hoist, and to supervise him properly during his work. At trial, Del Cid testified that he was never instructed not to climb onto the injection molding machines while they were being operated (Tr. 437–38). Majestic failed to introduce any evidence concerning the training and supervision of its employees with respect to the use of chain hoists, or any admonitions not to climb onto injection molding machines while they were being operated (Tr. 273, 445).

To refute Del Cid's testimony, Majestic called on Glenn Davis, a former employee and general manager of Majestic from 1979 through 1993, to give testimony concerning Majestic's operations during the period when Del Cid was injured (Tr. 251). Although Davis testified that it was not Majestic's custom and practice to have employees climb onto injection molding machines while they were being operated (Tr. 260), he also stated that he was unaware of the specific training given to Majestic employees on the use of chain hoists or on how to perform procedures near or at the top of the plastics machines (Tr. 272–73). According to Davis, the training of employees was done on an "apprentice basis" and was the responsibility of the employee's direct supervisor (Tr. 273). However, Del Cid's direct supervisor, Alex Rodriguez, was not available and was not called as a witness for Majestic (Tr. 445). Based on Del Cid's testimony, and the lack of adequate refutation, it can be inferred that Del Cid never received a specific admonition not to climb onto the machines while they were being operated. Accordingly, given all the evidence, it was certainly foreseeable to Majestic's supervisors—if they did not have actual knowledge—that Del Cid would climb onto the machine in order to free the entangled chain hoist.

### 3. Proximate Cause

█ In order to sustain a claim for damages as a result of a design defect, a plaintiff must also prove that the defect was the proximate cause of his or her injuries. *See, e.g., Micallef, supra.* New York courts interpret proximate cause in design defect cases to require the defect to be a "substantial factor" in causing the injury. *Voss, supra,* 59 N.Y.2d at 109, 450 N.E.2d at 208, 463 N.Y.S.2d at 402. Given the characteristics of the plastic injection molding machine involved in this case—an inherently dangerous and partially unguarded machine—and Del Cid's unrefuted explanation of how the accident occurred, it is appropriate to conclude that the design defect was a substantial factor in causing the accident (Tr. 495). *See Voss, supra,* 59 N.Y.2d at 110–11, 450 N.E.2d at 209–10, 463 N.Y.S.2d at 403–04. Simply put, had an appropriate guard been in place over the point of operation of the machine, Del Cid would not have been injured.

---

direction to *owners, employers,* supervisors, and other concerned with, or responsible for its application." *Id.* at § II (Purpose) (emphasis added). Therefore, the standards are applicable to Majestic, which was the owner and operator of the hoist.

At trial, Beloit argued that Del Cid's negligent misuse of the machine was the proximate cause of the accident rather than its failure to properly guard the machine. In addition, Beloit argued that Majestic's failure to train or supervise Del Cid properly on how to free an entangled chain hoist or to equip the hoist with an appropriate chain container were also proximate causes of the accident. Therefore, Beloit argued that it should not be held liable for Del Cid's injuries (Tr. 499).

Although a plaintiff's or third-party's negligent acts are always relevant to the issue of damages, seldom are they sufficient to preclude a finding that a design defect was the proximate cause of an injury. *See, e.g., Voss, supra,* 59 N.Y.2d at 110 n., 463 N.Y.S.2d 398, 450 N.E.2d 204; *Rivera v. MKB Industries, Inc.,* 149 A.D.2d 676, 677, 540 N.Y.S.2d 316, 318 (2d Dep't 1989); *Craft v. Mid Island Department Stores, Inc.,* 112 A.D.2d 969, 971, 492 N.Y.S.2d 780, 783 (2d Dep't 1985); *Sheppard v. Charles A. Smith Well Drilling and Water Sys.,* 93 A.D.2d 474, 478, 463 N.Y.S.2d 546, 548–49 (3d Dep't 1983); *Foley v. State,* 265 A.D. 682, 685–86, 41 N.Y.S.2d 256, 259–60 (4th Dep't 1943) (the fact that an accident would not have occurred but for the intervening act is insufficient to defeat finding the original negligent act the proximate cause of the accident). Under New York law, a manufacturer can escape liability for producing an unreasonably unsafe product only where the intervening negligent act was abnormal, unforeseeable, and the *sole cause* of the injury. *See, e.g., Woodling v. Garrett Corp.,* 813 F.2d 543, 556 (2d Cir.1987); *Grant, supra,* 877 F.Supp. at 817; *Derdiarian, supra,* 51 N.Y.2d at 315, 414 N.E.2d at 670, 434 N.Y.S.2d at 169.

Here, even though Del Cid's negligent act of balancing himself on a two-inch-wide angle bracket in order to free the entangled chain hoist may have contributed to the accident, it can only be relevant to the issue of damages. As discussed below, see discussion § 5, while Del Cid's *specific* act of balancing himself on the angle bracket was unintended and might not be foreseeable, the fact that an employee might stand on top of the machine for some normal purpose and get hurt doing so precludes a finding that Del Cid's conduct was the sole cause of his injuries. *See Woodling, supra; Vanskike v. ACF Industries, Inc.,* 665 F.2d 188, 195 (8th Cir.1981), *cert. denied sub nom., St. Louis–San Francisco Railway Co. v. Vanskike,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); *Grant, supra,* 877 F.Supp. at 817; *Sheppard, supra,* 93 A.D.2d at 477–78, 463 N.Y.S.2d 546 (*citing Voss, supra; Micallef, supra* ). Similarly, although Majestic's failure to equip the chain hoist with an appropriate chain container and to train and supervise Del Cid properly on how to free an entangled chain hoist contributed to the accident, these failures do not belie the foreseeability that a person could be on top of the machine doing a normal and expected activity while it was being operated, even if not the particular activity involved here. *See generally In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 839 (2d Cir.1992) (employer's negligent failure to warn or otherwise protect employees against known dangers of asbestos were foreseeable and did not relieve manufacturer of liability); *Woodling, supra,* 813 F.2d at 556 (same). As stated above, had the pinch point been properly guarded, as it easily and inexpensively might have been, this accident never would have happened.

Moreover, within the context of this proximate cause analysis, even if Del Cid's alleged negligent misuse of the machine and Majestic's failure to provide an appropriate chain container and to properly train and supervise Del Cid all were unforeseeable, that would not defeat the fact that Beloit's failure to properly guard the pinch point was a proximate cause of the accident. *See* Restatement (Second) of Torts § 435(1) (1977) ("If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor [did not foresee] ... *the manner in which it occurred does not prevent him from being liable.*") (emphasis added). *See also* Keeton, et al., *Product Liability & Safety,* at 502. As Professor Twerski notes, where a product has been defectively designed *and* has been unforeseeably misused by the plaintiff:

> The defect was a cause of the injury and the misuse was a cause. Cause cannot be apportioned, only fault ... proximate

**554**

cause is after all a legal fiction. It is an analytical tool which helps us decide whether the harm is to be placed at the defendant's doorstep. There is no good reason why the issue raised by proximate cause or intervening cause should not be factored into the apportionment [of fault] between the parties. The relative accountability for the end result is something which can be taken into account in a fault apportionment.

Twerski, *supra* at 432. At most, therefore, Del Cid's and Majestic's actions can be considered additional proximate causes of the accident making the three parties joint tortfeasors. *Id.* at 431–36; *Sheppard, supra,* 93 A.D.2d at 477, 463 N.Y.S.2d at 548; *General Motors v. Hopkins,* 548 S.W.2d 344, 352 (Tex. 1977).

### 4. Beloit's and Majestic's Comparative Fault

As discussed in the preceding section, it is clear that the conduct of each of the parties contributed to Del Cid's accident. However, the question remains, how much fault is to be attributed to Beloit and Majestic?

Based on the evidence adduced at trial, it is clear that Beloit bears the greatest portion of the fault in causing Del Cid's injuries. Had Majestic attached an appropriate chain container to the chain hoist, the likelihood of a serious injury would have been greatly reduced, but not eliminated. The same cannot be said of Beloit's negligence. Notwithstanding Majestic's allegedly negligent acts, had Beloit properly guarded the shear point, the risk that Del Cid would have been seriously injured would have been almost completely eliminated. Accordingly, based on the evidence at trial, it is fair to conclude that Beloit is liable for two-thirds (66⅔ percent) of Del Cid's damages while Majestic is liable for one-third (33⅓ percent).

### 5. Damages

■ At trial, Del Cid's economic expert, Dr. Morton I. Jaffe, testified as to Del Cid's

economic damages. Dr. Jaffe provided two projections which took into account Del Cid's future economic losses, medical expenses, and an offset for his prospective ability to perform alternative types of work in the future.[12] The only difference in the two projections is that one ("Table 2") assumes that Del Cid would continue working in a minimum wage until the end of his work-life expectancy, while the other ("Table 3") assumes Del Cid would find alternative work as an inspector or assembler doing sedentary bench work in a small electronics factory (Tr. 363).

At this point in time it is difficult to determine Del Cid's ability to perform alternative types of work in the future with any degree of certainty. However, given Del Cid's current limited physical capabilities and his limited ability to speak English, it seems unlikely that he will be able to do anything but a minimum wage job. Accordingly, Dr. Jaffe's projections in Table 2, which include an offset for Del Cid's future earnings from minimum wage jobs is the most appropriate measure of Del Cid's economic damages. Based on these projections, it is reasonable to find that Del Cid's total economic damages are $250,000, of which $130,000 represents future medical expenses and $120,000 represents lost wages.[13]

In addition to his economic damages, Del Cid is entitled to recovery for the considerable pain and suffering he endured, and continues to endure, as a result of his injuries. Based on Del Cid's testimony at trial, and the testimony of Mr. Alfred Lehneis, the board certified prosthetist who has been treating Del Cid since his injury (Tr. 289–98), it is fair and reasonable to award Del Cid $150,000 for past and future pain and suffering.

### 6. Del Cid's Comparative Fault

■ The final issue is whether Del Cid's recovery should be reduced by his alleged negligent acts of climbing onto the plastic injection molding machine to free the entan-

**12.** Dr. Jaffe's projections were revised subsequent to trial to take into account a 2% discount rate per year on any damages (Tr. 365–72).

**13.** In accordance with Dr. Jaffe's projections, these figures, too, take into account a discount rate of two percent per year.

gled chain hoist. Based on the testimony at trial, it is clear that Del Cid did not act negligently when climbed onto the molding machine to free the entangled chain hoist. Specifically, Del Cid's unrefuted testimony established that for a number of reasons it was expedient and efficient for him to climb onto the machine to free the entangled chain hoist rather than use a ladder to do so. First, as the ladder closest to machine number 30 was cumbersome, it would have been very difficult and time consuming for him move it himself (Tr. 399–401). Second, Del Cid did not have the authority or opportunity to ask another employee to help him move the ladder (Tr. 402–03). Third, according to Del Cid, the ladder closest to machine number 30 was only appropriate for use in loading the hopper and was not appropriate to free the entangled chain hoist (Tr. 401, 417–19). Fourth, even if the ladder closest to machine number 30 would have been appropriate for such a use, in order for Del Cid to position the ladder in such a way as to reach the entangled chains, he would have had to remove the tables and other equipment situated on top of the operator's platform of machine number 30, and move the platform itself (Tr. 401, 419). This procedure would have taken about thirty minutes (Tr. 401, 419), and would have stopped production on machine number 30, something Majestic would not have appreciated. Fifth, Del Cid had no authority to tell the machine operator to turn off the molding machine so he could move her equipment, reposition the ladder and free the entangled chain hoist. In sum, climbing on top of the machine was the most efficient and expedient way for Del Cid to free the entangled chain hoist and quickly accomplish the task requested of him. Factory employees such as Del Cid should be free to accomplish their assigned tasks in an efficient and expedient manner, even when this entails the use—in retrospect—of an arguably dangerous procedure (Tr. 415).[14]

Del Cid's negligence, if any, occurred once he was on top of the molding machine and attempted to balance himself on the slick two-inch-wide angle bracket while he shook the hand chain. As agile as he was, Del Cid should have realized that at the very least he was at risk of falling to the factory floor, if not into the machine. However, this negligent act is insignificant when compared to Beloit's failure to properly guard the shear point on top of the machine, or Majestic's failure to provide an appropriate chain container or to train Del Cid properly on how to free the entangled chain hoist. Accordingly, Del Cid's recovery should be reduced by ten (10) percent.

**Conclusion**

Based on the foregoing, Del Cid's damages amount to $400,000, with represents past and future wages of $120,000, future medical expenses of $130,000, and pain and suffering in the amount of $150,000. However, Del Cid's damages are reduced by ten (10) percent because of his comparative fault, which leaves a total of $360,000 in damages. Beloit is, therefore, liable for two-thirds of this sum,

---

14. In *Micallef*, the New York Court of Appeals relaxed the rule that there is no liability for the design of a patently dangerous machine where it was the custom and usage in the printing industry for machine operators to knowingly perform dangerous procedures while operating high speed printing presses, even where the particular procedure was an unintended use of the machine. *Micallef, supra,* 39 N.Y.2d at 385, 384 N.Y.S.2d 115, 348 N.E.2d 571. At issue in *Micallef* was the practice of "chasing hickies" on the run—lightly applying an eight-inch-wide piece of plastic to a printing plate of a high speed printing press in order to remove a foreign object from the plate. As the printing plate moves at a very high speed, chasing hickies creates the possibility that the plastic piece could get pulled into the press, thereby causing the operators hand to get caught in the press. The Court of Appeals determined that the process of chasing hickies, although dangerous and an unintended use of the machine, was appropriate because it was expedient given the nature and design of the machine, and the needs of the industry—once the printing press is disengaged and turned off, it takes at least three hours to resume printing, thereby greatly decreasing the financial advantage of the high speed printing press. *Id.* at 380, 384 N.Y.S.2d 115, 348 N.E.2d 571. Similarly dangerous and unintended procedures and uses have been sustained by other courts as not a bar to recovery for a design defect. *See, e.g., Robinson v. G.G.C., Inc.,* 107 Nev. 135, 808 P.2d 522 (1991); *Uloth v. City Tank Corp.,* 376 Mass. 874, 879–80, 384 N.E.2d 1188, 1192 (1978); *Ritter v. Narragansett Electric Co.,* 109 R.I. 176, 283 A.2d 255 (1971). *See also* Twerski, *supra* at 420–22.

or $240,000, while Majestic is liable for one-third, or $120,000.

SO ORDERED.