**Cristono ALMONTE, Plaintiff,**

v.

**AVERNA VISION & ROBOTICS, INC., Defendant.**

**No. 11–CV–1088 EAW.**

United States District Court, W.D. New York.

Signed Aug. 31, 2015.

Filed Sept. 3, 2015.

---

733

David R. Addelman, Addelman & Marszalkowski, PC, Buffalo, NY, for Plaintiff.

Eric Samuel Bernhardt, Smith Sovik Kendrick & Sugnet, P.C., Buffalo, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

### *INTRODUCTION*

Plaintiff Cristono Almonte ("Plaintiff") has sued Defendant Averna Vision & Robotics, Inc. ("Defendant") for damages for personal injuries he sustained during the course of his employment with Brunner International, Inc. ("Brunner" or "Plaintiff's employer") while working on the "Brake Shoe Inspection and Classification System" (the "Inspection System") designed by Defendant. Plaintiff's Complaint against Defendant alleges claims for negligence (first cause of action); breach of implied warranty (second cause of action); strict products liability (third cause of action); and breach of express warranty (fourth cause of action). (Dkt. 1–1).

Defendant moves for summary judgment in its favor under Rule 56 of the Federal Rules of Civil Procedure as to all of the claims in Plaintiff's Complaint. (Dkt. 35). In addition, Defendant moves to exclude the testimony of Plaintiff's expert, John Coniglio, pursuant to Rule 702 of the Federal Rules of Evidence. (Dkt. 35–3 at 4). Plaintiff moves for summary judgment under Rule 56 only on the issue of liability as to the negligent failure to warn claim. (Dkt. 33).

For the reasons set forth below, Defendant's motion for summary judgment (Dkt. 35) is granted in part, insofar as Defendant seeks summary judgment on Plaintiff's breach of implied warranty claim (second cause of action), and on Plaintiff's negligence (first cause of action) and strict products liability (third cause of action) claims but only to the extent they are based upon an alleged manufacturing defect. Defendant's motion for summary judgment (Dkt. 35) is otherwise denied. Defendant's motion to exclude the testimony of Plaintiff's expert (Dkt. 35–3 at 4) is granted in part, insofar as Defendant challenges Plaintiff's expert's reliance upon Occupational Safety and Health Administration ("OSHA") regulations; American Society of Mechanical Engineers ("ASME") industry standards governing emergency-stop devices, which are set forth in ASME B20.1–2003, 5.11; and the Conveyor Equipment Manufacturer Association ("CEMA") document entitled "Safety Label Brochure," No. 201, Second Edition (2006). Defendant's motion to exclude is otherwise denied. Plaintiff's motion for summary judgment (Dkt. 33) is denied.

### *BACKGROUND*

#### I. Plaintiff's Accident

On November 19, 2008, while working as a machine operator[1] for Brunner at its

---

**1.** The exact nature and responsibilities of Plaintiff's job on the date of the accident, as well as the location of his work station, are disputed. Plaintiff asserts that on the date of the accident, his supervisor instructed him to

correct shoes that had flipped over and he was standing on the Left Side of the Conveyor. (Dkt. 33–16 at 10, 13, 17, Almonte Dep.). According to Plaintiff's supervisor, Plaintiff

manufacturing facility in Medina, New York, Plaintiff reached with his left gloved hand across a moving conveyor (the "Conveyor"). (Dkt. 35–4 at ¶ 28; Dkt. 42 at ¶ 28). In reaching across the Conveyor, Plaintiff intended to pick up and straighten a brake shoe that had fallen over (Dkt. 35–4 at ¶ 28; Dkt. 42 at ¶ 28), which was prone to happen on occasion (Dkt. 35–4 at ¶¶ 41–42; Dkt. 42 at ¶¶ 41–42; Dkt. 33–1 at ¶ 23; Dkt. 37–2 at ¶ 23).[2] When Plaintiff reached his hand over the Conveyor, his glove was caught by an advancing chain[3] on the Conveyor. (Dkt. 35–4 at ¶ 28; Dkt. 42 at ¶ 28; Dkt. 33–1 at ¶ 33; Dkt. 37–2 at ¶ 33). Plaintiff's gloved hand was dragged a short distance to a computer-controlled ram (also referred to as a pusher). (Dkt. 35–4 at ¶ 28; Dkt. 42 at ¶ 28). The ram activated on command from a control computer, extended out, and crushed Plaintiff's hand, causing injury to it. (*See* Dkt. 35–4 at ¶ 28; Dkt. 42 at ¶ 28).

As a result of the accident, Plaintiff sustained a large laceration around the circumference of his left thumb where his thumb meets his hand, as well as broken tendons, which required three surgeries and therapy and continues to cause him pain. (Dkt. 33–16 at 18–25, Almonte Dep.). Plaintiff is presently unable to perform the kind of heavy-lifting work that he did before his injury. (*Id.* at 24–25).

## II. Defendant's Design and Installation of the Inspection System

The Conveyor is part of the Inspection System that Defendant[4] specially designed and manufactured for Brunner. (Dkt. 35–4 at ¶¶ 3–16; Dkt. 42 at ¶¶ 3–16). The purpose of the Inspection System is to sort brake shoes by size. (Dkt. 35–4 at 7–8; Dkt. 42 at 7–8). As part of its specifications for the sorting system, Brunner gave explicit instructions to Defendant about how fast the Inspection System had to operate to interface properly with other parts of the manufacturing process. (Dkt. 35–4 at 5–6; Dkt. 42 at ¶¶ 5–6).

In 2004, Defendant installed the system in Brunner's facility. (Dkt. 35–4 at ¶ 16; Dkt. 42 at ¶ 16). The Inspection System was installed next to the E–Coat line. (Dkt. 35–4 at 6; Dkt. 42 at 6). At the time the Inspection System was sold and installed, Defendant knew that there was a possibility that if proper adjustments were not made, the brake shoes would sometimes flip over. (Dkt. 33–1 at ¶ 24; Dkt.

was performing the job of transfer operator on the date of the incident, which would have been 10–12 feet away from the Conveyor. (Dkt. 33–14 at 4, 14 Palone Dep.). The transfer operator is responsible for putting brake shoes on the E–Coat line. (*Id.*).

**2.** Although the parties dispute the frequency with which brake shoes would flip over, both parties agree that the shoes flipped over at least "on occasion." (Dkt. 33–1 at ¶ 23; Dkt. 37–2 at ¶ 23).

**3.** It appears from Brunner's Accident and Investigation Report in the record that the part that caught Plaintiffs glove was one of the advancing chains on the Conveyor (Dkt. 33–17), although the record is not entirely clear and Defendant appears to dispute the authenticity of Brunner's Accident and Investigation

Report. Yet, Defendant does not identify any other part on the Conveyor that caught Plaintiffs glove. Nevertheless, neither party has argued that identification of the actual part that caught Plaintiffs glove is material to the Court's resolution of the motions for summary judgment.

**4.** For ease of reference, the Court refers to both Defendant and Defendant's predecessor, Invensys Vision and Robotics Group, as "Defendant," which is consistent with the manner in which the parties have referred to Defendant's predecessor in their respective Statements of Material Fact (Dkt. 42, Dkt. 35–4). In doing so, the Court makes no determination as to whether Defendant is liable for its predecessor's conduct as a successor corporation.

37–2 at ¶ 24; Dkt. 33–5 at 55, Cormier Dep.). Likewise, Defendant knew at that time that there were "pinch points" and moving parts on the main Conveyor, such as the space between the roller and the Conveyor and the space where the chain is located, and that those pinch points were within reach of a person who attempted to straighten a fallen brake shoe. (Dkt. 33–1 at ¶ 37; Dkt. 37–2 at ¶ 37; Dkt. 33–5 at 90, Cormier Dep.).

When Defendant designed and delivered the Inspection System, Defendant did not provide Brunner with any explicit instructions or warnings prohibiting operators from working or standing on the side of the Conveyor that was adjacent to the E–Coat line (the "Left Side" of the Conveyor). (Dkt. 33–5 at 76, Cormier Dep.). Defendant did not install any physical guards over the Conveyor unit. (Dkt. 35–4 at ¶¶ 9–20; Dkt. 42 at ¶¶ 19–20). Defendant did not instruct Brunner to install guards around the Conveyor unit. (Dkt. 33–1 at ¶ 28; Dkt. 37–2 at ¶ 28). Instead, Defendant asked Brunner "to approve the [S]ystem and [to] make sure it me[t] their rules—their safety rules." (Dkt. 33–5 at 76, Cormier Dep.).

### III. Post–Accident Guard

Following Plaintiff's accident, Brunner installed a guard over and around the Conveyor. (Dkt. 35–4 at ¶¶ 19–20; Dkt. 42 at ¶¶ 19–20). The guard was made onsite by Brunner, probably by its maintenance department. (Dkt. 35–4 at ¶¶ 19–20; Dkt. 42 at ¶¶ 19–20).

### IV. The Live Main Conveyor and the Connected Parts

At the time of Plaintiff's injury, the Conveyor was "live," in that it was powered by a power source, and the power was turned on. (Dkt. 35–8 at 56, Coniglio Dep.). The Conveyor itself has two chains, and in between the two chains are plastic rollers that hold the brake shoes in place. (Id. at 43).

The Conveyor is flanked on the Left Side by a series of "pushers," which are attached, and positioned perpendicular, to the Conveyor. The ram of the pusher extends and pushes the moving brake shoes off of the main Conveyor. (Dkt. 35–4 at ¶ 8; Dkt. 42 at ¶ 8). Plaintiff's injury occurred on the Left Side of the Conveyor, where the pushers are located. (Dkt. 35–4 at ¶ 27; Dkt. 42 at ¶ 27).

The Conveyor is flanked on the right side by a corresponding series of "gravity conveyors," which are also attached, and positioned perpendicular, to the Conveyor. Each pusher faces a corresponding gravity conveyor, which work in tandem together. (Dkt. 35–4 at ¶ 8; Dkt. 42 at ¶ 8). The ram of the pusher pushes the moving brake shoes off of the main Conveyor and onto the corresponding gravity conveyor, which then moves the brake shoes down the conveyor by the force of gravity. (Dkt. 35–4 at ¶ 41; Dkt. 42 at ¶ 41).

### V. The Problem of Flipped Brake Shoes

Sometimes, brake shoes flipped over, especially smaller ones due to the force of the pusher. (Dkt. 35–4 at ¶ 41; Dkt. 42 at ¶ 41). The brake shoes flipped at the point where the pushed brake shoes were about to go from the main Conveyor onto the gravity conveyors. (Dkt. 35–4 at ¶ 41; Dkt. 42 at ¶ 41). When a brake shoe flipped over onto the gravity conveyor, the flipped shoe prevented subsequent shoes from moving forward, thereby interrupting the cycle time for the Inspection System, which then created a backlog on the E–Coat line. (Dkt. 33–1 at 23; Dkt. 37–2 at ¶ 23).

The stackers, who were stationed on the right side of the Conveyor, had the job of correcting the position of the brake shoes

that had fallen over. (Dkt. 35–4 at ¶ 49; Dkt. 42 at ¶ 49). To correct the position of the brake shoes from the Left Side of the Conveyor, on the other hand, employees had to reach across the moving Conveyor. (Dkt. 35–4 at ¶ 28; Dkt. 42 at ¶ 28).

Richard Palone, Plaintiff's supervisor, testified that he had observed people from time to time manually reposition brake shoes from the Left Side of the Conveyor while the Conveyor was moving. (Dkt. 33–14 at 10, 18, Palone Dep.). Mr. Palone testified that he "imagine[d] it happened a lot." (*Id.* at 18). Mr. Palone testified that he observed "the Vision guy," i.e. apparently Defendant's representative, manually reach over the Conveyor from the Left Side to adjust a brake shoe. (*Id.*) Plaintiff testified that before the date of the accident, he had been assigned to flip brake shoes from the Left Side of the Conveyor on two or three previous occasions. (Dkt. 33–16 at 17, Almonte Dep.).

Nevertheless, Mr. Palone, Plaintiffs supervisor, testified that other than maintenance workers, employees were not supposed to flip brake shoes over from the Left Side of the Conveyor because it was unsafe. (Dkt. 33–14 at 18, Palone Dep.).

If brake shoes were flipping over, employees could make an adjustment to the air pressure on the pushers to reduce the frequency of the problem by adjusting the valves on the pusher. (Dkt. 35–4 at ¶ 46; Dkt. 42 at ¶ 46). The adjustments would be made on the Left Side of the Conveyor by a maintenance employee or a supervisor. (Dkt. 35–4 at ¶ 47; Dkt. 42 at ¶ 47). There is no testimony as to the frequency of the adjustments. (Dkt. 35–4 at ¶ 47; Dkt. 42 at ¶ 47). To adjust the valves on the pushers, the E–Coat line would be shut off briefly (for a minute) so that the employee could access the Left Side of the Conveyor and quickly make the adjustments. (Dkt. 35–4 at ¶ 48; Dkt. 42 at ¶ 48).

## VI. Accessing the Left Side of the Conveyor from the E–Coat Line

Plaintiff's supervisor, Richard Palone, testified at his deposition that he believed that Brunner had an unwritten safety policy that employees were not supposed to walk between the racks on the E–Coat line. (Dkt. 33–14 at 14, Palone Dep.). According to Mr. Palone, due to the racks on the E–Coat line, employees were not permitted to walk from the E–Coat line to the Left Side of the Conveyor. (*Id.* at 18).[5] Despite the safety policy, Plaintiff testified that he accessed the Left Side of the Conveyor by walking all the way around the Conveyor on the date of the accident, thereby avoiding the E–Coat line. (Dkt. 33–16 at 16, Almonte Dep.).

## VII. Working on the Left Side of the Conveyor

An employee of Brunner and Defendant's representative, Pascal Cormier, testified that nobody was needed to work on the Left Side of the Conveyor. (Dkt. 33–5 at 44, Cormier Dep.; Dkt. 33–15 at 21, Wagner Dep.).

Plaintiff testified that he was assigned to work on the Left Side of the Conveyor on the date of the accident (and that he had been previously assigned to work there two or three times). (Dkt. 33–16 at 10, 13, 17, Almonte Dep.).

---

**5.** Mr. Wagner, a manufacturing engineer at Brunner, testified at his deposition that he was not aware of any safety issues with having employees work on the Left Side of the Inspection System and that he did not know of any safety policy prohibiting employees from passing underneath or through moving conveyor lines. (Dkt. 33–15 at 20–21, Wagner Dep.).

## VII. Warning Decals

On top of the pushers or rams on the Inspection System were warning labels, which had the words "Danger" and "Watch Your Hands and Fingers" (in English) and showed a picture of one's fingers being pinched in moving gears. (Dkt. 35–4 at ¶ 52; Dkt. 42 at ¶ 52; Dkt. 35–1 at 21).

## IX. Procedural History

Plaintiff commenced this products liability/personal injury action against Defendant in New York State Supreme Court, Erie County, on March 18, 2011. (Dkt. 1 at ¶ 1). Defendant removed this action on December 23, 2011. (Dkt. 1). The Notice of Removal alleges diversity jurisdiction, in that Plaintiff is an individual and a citizen of the state of New York, Defendant is a foreign business corporation and a citizen of Canada, and Plaintiff has demanded more than $10 million in damages. (*Id.* at ¶¶ 4–6). The Notice of Removal was timely filed within thirty days of Defendant having learned of the amount in controversy. (*Id.* at 8).

Plaintiff ·filed a motion for summary judgment on May 5, 2014. (Dkt. 33). Defendant filed a motion for summary judgment and a motion exclude the testimony of Plaintiff's expert, John Coniglio, on May 16, 2014. (Dkt. 35; Dkt. 35–3 at 4). Responses were filed on June 16, 2014 and June 17, 2014. (Dkt. 37–39).[6] Replies were filed on July 3, 2014. (Dkt. 41, 42). The case was transferred to the undersigned on January 27, 2015. (Dkt. 46). Oral argument was held on June 5, 2015, and the Court reserved decision.

6. Plaintiff filed his counter-statement of material facts on October 23, 2014, and simultaneously moved for permission to file this document late. (Dkt. 42, 43). Defendant opposed the motion. (Dkt. 44). The Court granted the motion for late filing on December 9, 2014. (Dkt. 45).

## DISCUSSION

### I. Legal Standard

#### A. Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. Under Rule 702, the trial court acts as a gatekeeper with respect to expert testimony. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The district court is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).[7] Nevertheless, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from

7. Under the Federal Rules of Evidence, the Court must evaluate evidence for admissibility before considering that evidence in deciding a motion for summary judgment. *See* Fed.R.Evid. 104(a); *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997).

the previously widely followed, and more restrictive, standard...." *Nimely v. City of N.Y.*, 414 F.3d 381, 395 (2d Cir.2005).

## B. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec.*, 475 U.S. at 586–87, 106 S.Ct. 1348) (emphasis in original). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

## II. The Admissibility of Mr. Coniglio's Opinion

During the course of this litigation, Plaintiff retained an expert, John Coniglio, to render opinions about the allegedly defective design of the Conveyor and the adequacy of the warnings on the pushers adjacent to the Conveyor. Mr. Coniglio produced an Affidavit (Dkt. 25–2) and testified at a deposition (Dkt. 35–8) concerning his opinions. Defendant now moves to exclude Mr. Coniglio's testimony pursuant to Rule 702 of the Federal Rules of Evidence. (Dkt. 35–3 at 4).

## A. Mr. Coniglio's Qualifications

█ In order for a witness to render opinion testimony at trial, he or she must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. To determine whether a witness is qualified to render an expert opinion, the Court engages in a two-part inquiry:

> [T]he court must first ascertain whether the proffered expert has the educational background or training in a relevant field. Then the court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert ... to testify only if the expert's particular expertise ... enables the expert to give an opinion that is capable of assisting the trier of fact.

*TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F.Supp.2d 171, 174 (N.D.N.Y.2002). In assessing expert qualifications, "[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." *Lappe v. Am. Honda Motor Co., Inc.*, 857 F.Supp. 222, 227 (N.D.N.Y.1994), *aff'd*, 101 F.3d 682 (2d Cir.1996). "An expert must, however, stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." *Id.*

█ As to his educational background, training, and experience, Mr. Coniglio received a Bachelor's degree in Industrial Technology from the "SUNY System," a Master's degree from Columbia Southern

University in Occupational Safety and Health Management, and a Ph.D. from Kennedy Western University in Safety Engineering, in addition to other degrees. (Dkt. 25–2 at 2). Mr. Coniglio is a Certified Safety Professional and is an instructor on safety in the areas of construction and general industry. (*Id.* at ¶ 3). He has been a practicing safety consultant for over 40 years. (*Id.* at ¶ 2.) Mr. Coniglio testified at his deposition that, in his capacity as a safety engineer, he has assisted several companies with the safety aspect of the installation and testing of conveyors, including the use of guarding. (*Id.* at ¶ 6; Dkt. 35–8 at 9–11, Coniglio Dep.). He has developed training materials and trained design engineers on the design and placement of guarding on mechanical equipment. (Dkt. 25–2 at ¶ 6; Dkt. 35–8 at 19, Coniglio Dep.). In addition, he has been involved in and/or testified in several other court cases concerning conveyors. (Dkt. 25–2 at ¶ 6; Dkt. 35–8 at 17, Coniglio Dep.).

■ Having considered Mr. Coniglio's background, the Court now considers the particular opinions that Mr. Coniglio seeks to offer. Mr. Coniglio seeks to offer an opinion in support of Plaintiff's design defect claim under New York law. To show that a product was not reasonably safe and thus defectively designed, a plaintiff must show that: "(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiffs injury." *Colon ex rel. Molina v. BIC USA, Inc.,* 199 F.Supp.2d 53, 83 (S.D.N.Y. 2001) (citing *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 108–09, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983)). Mr. Coniglio seeks to offer an opinion on the first and third elements, and regarding the second element, Mr. Coniglio has opined that the fixed guard installed by Plaintiff's employer made the Conveyor a safer product.

Based upon Mr. Coniglio's background, the Court concludes, rather easily, that Mr. Coniglio is qualified to render opinions in support of Plaintiff's claim that the Conveyor in this case posed a substantial likelihood of harm and caused Plaintiff's injury and that the addition of the fixed guard made the Conveyor safer. His expertise in the area of safety engineering is capable of assisting a trier of fact. While Defendant questions Mr. Coniglio's qualifications because he is not a mechanical engineer and has never designed a conveyor system or any other mechanical equipment, Mr. Coniglio does not seek to offer a proposed alternative guard that could be used on the Conveyor. There is no dispute that Mr. Coniglio has not designed such a device for the Conveyor. Rather, Mr. Coniglio offers an opinion that the lack of guarding surrounding the main Conveyor was unsafe and caused Plaintiff's injury. (Dkt. 25–2 at ¶¶ 17, 20). His opinion focuses on the safety concerns associated with the lack of a guard in the system that existed at the time of Plaintiff's injury. In addition, during his deposition, Mr. Coniglio pointed to the permanent guard designed and installed by Plaintiff's employer as a safer alternative than the absence of any guard at all.

Mr. Coniglio's considerable training and experience as a safety engineer—in general and with respect to the specific area of conveyors—qualifies him to opine as to the safety of conveyors. It is not necessary that Mr. Coniglio be a mechanical engineer or have design experience to opine on questions relating to the safety of the unguarded Conveyor. *King v. Brandtjen & Kluge, Inc.,* No. 94–CV–411C(M), 2001 WL 1804345, at *6 (W.D.N.Y. June 20, 2001) (holding that safety professional's training and experience qualified him to offer an opinion on the adequacy of the subject press's safety and guarding even though he "[wa]s not an academically trained engineer"); *Hilaire v. DeWalt Indus. Tool Co.,*

54 F.Supp.3d 223, 242 (E.D.N.Y.2014) ("Having considered Mr. Barbe's qualifications, the Court finds that it is not necessary that Mr. Barbe be an electrical or mechanical engineer in order to opine on questions of the safety elements of a product's design. As a safety engineer, registered in two states, with the education and experience that he has obtained in the course of his career, he is qualified to render an opinion as to whether a product performs safely in light of its foreseeable uses and misuses."); *Keenan v. Mine Safety Appliances Co.*, No. CV–03–0710 TCP ARL, 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006) (allowing safety expert to testify about alternative designs for safety glasses where he was not an engineer and had "never worked for a company that manufactures safety glasses, or dealt extensively with safety glasses" because he was not proposing a new design).

Defendant's challenges to Mr. Coniglio's academic training and his other alleged shortcomings, concern the weight and credibility of his testimony (not admissibility) and may be explored at trial on cross-examination. *See McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995) ("Fuller's quibble with Woolley's academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility.").

For these reasons, the Court concludes that Mr. Coniglio is qualified to offer an opinion on the essential issues of whether the product as designed posed a substantial likelihood of harm, whether the defective design was a substantial factor in causing Plaintiff's injury, and whether the guard installed by Plaintiff's employer provides overall improved safety.

## B. The Reliability of Mr. Coniglio's Expert Testimony

The Second Circuit has summarized the gatekeeping role the Court undertakes in assessing whether an expert's testimony is reliable, as follows:

[T]he district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case.... [T]he inquiry envisioned by Rule 702 is a flexible one, and the gatekeeping inquiry must be tied to the facts of a particular case.

*Amorgianos*, 303 F.3d at 265–66 (citations, brackets, quotation marks, and ellipsis omitted).

Here, the Court finds that Mr. Coniglio's conclusion that the unguarded Conveyor was unsafe is based, at least in part, upon a reliable methodology. In preparation for his on-site inspection, Mr. Coniglio reviewed approximately twenty-five documents, including the original design and specifications for the machinery and photographs, as well as the depositions of Plaintiff and Pascal Cormier, the

representative produced by Defendant. (Dkt. 25–2 at 2–3; Dkt. 35–8 at 24, Coniglio Dep.). During his on-site inspection, Mr. Coniglio viewed the Conveyor and the related equipment, spoke with Plaintiff, took photographs of the equipment, observed the equipment in operation, and viewed the areas surrounding the Conveyor. (Dkt. 35–8 at 25–29, Coniglio Dep.). Based upon his inspection, his review of the relevant materials, his experience and background, and his consultation with federal safety regulations and industry standards, Mr. Coniglio concluded, *inter alia,* that the Conveyor presented hazards in the form of "nip points" that required affixed guarding, that no warnings were provided to alert the user to the unsafe condition, and that the lack of guarding and/or the lack of warnings caused the injury. (*Id.* at 82, 96).

In reaching his conclusion, Mr. Coniglio relied upon the following safety regulations and standards: (1) OSHA regulations governing "Machinery and Machine Guarding," which are set forth in 29 C.F.R. § 1910.212(a)(1)-(3); (2) ASME industry standards governing "Safety Standard for Conveyors and Related Equipment," which are set forth in B20.1–2003; and (3) a CEMA document entitled "Safety Label Brochure," No. 201, Second Edition (2006). (Dkt. 35–8 at 82, 94). The reliability of Mr. Coniglio's utilization of these regulations and standards as applied to the facts of this case is examined below.

### 1. Mr. Coniglio's Reliance upon OSHA Regulations Is Not a Reliable Methodology.

Under New York law, the issue of whether a product is defectively designed is determined by examining "the industry standards in effect when it was manufactured." *Gian v. Cincinnati Inc.,* 17 A.D.3d 1014, 1015, 794 N.Y.S.2d 215 (4th Dep't 2005). Here, Mr. Coniglio consulted OSHA regulations. Specifically, he

heavily relied upon the regulation entitled "Machinery and Machine Guarding," which is set forth in 29 C.F.R. § 1910.212(a)(1), (3). The regulation governing machine guarding provides, in part, as follows:

> One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks.... Guards shall be affixed to the machine where possible and secured elsewhere if for any reason attachment to the machine is not possible.

29 C.F.R. § 1910.212(a)(1)-(2).

Defendant argues that Mr. Coniglio's reliance upon the OSHA regulation is inappropriate because OSTIA regulations are applicable only to employer-employee relationships. Mr. Coniglio readily conceded in his deposition that OSHA governs the employer's obligations to its employees. (Dkt. 35–8 at 64, Coniglio Dep.). As apparent from his concession, Mr. Coniglio does not rely upon the OSHA regulations based upon the premise that the regulations impose a duty on Defendant, but rather as evidence of the industry standard at the time of manufacture.

In support of its proposition that Mr. Coniglio cannot rely upon OSHA regulations as the industry standard, Defendant cites *Jemmott v. Rockwell Manufacturing Co.,* 216 A.D.2d 444, 628 N.Y.S.2d 184 (2d Dep't 1995), for the proposition that OSHA regulations are not applicable in products liability actions against manufacturers. In that case, plaintiffs claimed that the product design was defective because it violated OSHA regulations and ANSI standards. *Id.* at 444, 628 N.Y.S.2d 184. The New York appellate court affirmed the lower court's order granting summary judgment for the manufacturer, holding that industry standards in general are not

relevant to products liability actions and that OSHA, in particular, governs only employer/employee relationships. *Id.* at 444–45, 628 N.Y.S.2d 184.

While the *Jemmott* court's blanket prohibition against industry standards in products liability actions does not accurately reflect the state of the law in New York, *see Church Ins. Co. v. Trippe Mfg. Co.*, No. 04 CIV. 6111(HB), 2005 WL 2649332, at *1 (S.D.N.Y. Oct. 17, 2005) ("*Jemmot[t]* appears to be against the weight of authority amongst the cases that have applied New York law."), the court's refusal to consider an OSHA regulation as evidence of the applicable industry standard in a products liability action against a manufacturer remains the law in New York, *see Wesp v. Carl Zeiss, Inc.*, 11 A.D.3d 965, 967, 783 N.Y.S.2d 439 (4th Dep't 2004) (holding that plaintiffs failed to raise a triable issue of act because plaintiffs' expert "based his opinion largely on safety standards, not manufacturing standards"); *Merritt v. Raven Co.*, 271 A.D.2d 859, 862, 706 N.Y.S.2d 233 (3d Dep't 2000) (concluding that plaintiff's expert's "reli[ance] upon the Occupational Safety and Health Administration (OSHA) standards regulating the safety practice of employers, not manufacturers, to support his opinion ... was woefully inadequate to raise a triable issue as to the design defect claim"); *Zapata v. Ingersoll Rand Co.*, 36 Misc.3d 1230(A), 2012 WL 3553111 (Kings County Sup.Ct.2012) (refusing to consider OSHA regulations in strict products liability action against manufacturer); *but see Rivera v. MKB Indus., Inc.*, 149 A.D.2d 676, 677–78, 540 N.Y.S.2d 316 (2d Dep't 1989) (finding that lower court erroneously refused to admit into evidence New York State Department of Labor regulations in products liability action against manufacturer).

Although there is no case from the Second Circuit Court of Appeals directly on point, federal district courts in this circuit have likewise suggested that a plaintiff should not be permitted to introduce OSHA regulations in actions against manufacturers, reasoning that "manufacturers would be unfairly held to standards that were not intended to be imposed upon them." *Sundbom v. Erik Riebling Co.*, No. 89 CIV. 4660(JSM), 1990 WL 128920, at *1 (S.D.N.Y. Aug. 28, 1990); *see also Byrne v. Liquid Asphalt Sys., Inc.*, 238 F.Supp.2d 491, 492 (E.D.N.Y.2002) ("[T]he admission of OSHA standards against the manufacturers in the present case would not assist the jury because OSHA standards were not intended to impose duties upon manufacturers and have no application against manufacturers of products."); *Frazer v. ITW Food Equip. Grp. LLC*, No. 11–CV–9699 CS, 2013 WL 6164486, at *3 (S.D.N.Y. Nov. 22, 2013) (finding that expert's opinion, which cited OSHA regulation governing machine guarding, was unreliable under *Daubert*). Here too, because "OSHA standards have federal backing and are widely known by lay people and thus the jury will likely give OSHA evidence great weight[,] ... [Mr. Coniglio's] testimony that the manufacturer[s] in this case 'violated' these standards would likely be greatly prejudicial and minimally probative considering that OSHA standards do not apply to manufacturers." *Byrne*, 238 F.Supp.2d at 493.

The Court recognizes that not all federal courts in this circuit are in agreement on the relevance of OSHA regulations in a products liability action against a manufacturer. Some courts have permitted plaintiffs' experts to rely upon OSHA regulations as evidence of the industry standard in cases brought against manufacturers of allegedly defective products. *Rupolo v. Oshkosh Truck Corp.*, 749 F.Supp.2d 31, 40 (E.D.N.Y.2010) (concluding that plaintiff's expert's methodology, including his reliance on ANSI and OSHA regulations, on the cause of plaintiff's injury in products

liability action against manufacturer was reliable); *Mustafa v. Halkin Tool, Ltd.,* No. 00–CV–4851 (DGT), 2007 WL 959704, at *9 (E.D.N.Y. Mar. 29, 2007) (concluding that plaintiff's expert's methodology, including his reliance on OSHA standards, in products liability action against manufacturer was reliable); *accord Rexrode v. Am. Laundry Press Co.,* 674 F.2d 826, 831 n. 18 (10th Cir.1982) (noting (without any analysis) that "it is clear that in determining an issue of defective design a jury properly may consider evidence that a product violated [OSHA and ANSI] safety standards which were in effect on the date of manufacture").

The presupposition underlying the decisions of the courts favoring the admissibility of OSHA regulations in actions against manufacturers appears to be that only well-known and widely-accepted safety standards in the industry give rise to OSHA regulations. *Mustafa,* 2007 WL 959704, at *9 (stating that the expert "relie[d] on OSHA regulations as evidence that it was well-known in the industry in and before 1990 that press brakes are not safe without guards at the point of operation and that these concerns were enough to give rise to industry standards, such as OSHA, which place the responsibility of installing guarding on the employer"). That may sometimes be the case. Yet, OSHA is not always constrained by industry standards in promulgating its safety regulations. *See Am. Airlines, Inc. v. Sec'y of Labor,* 578 F.2d 38, 41 (2d Cir. 1978) ("[W]e note that OSHA is not pre-

cluded from promulgating, after notice and comment, new and specific regulations requiring safety precautions beyond those considered reasonable in the industry.").[8]

In this case, the issue of whether the OSHA machine guarding regulation set forth in 29 C.F.R. § 1910.212(a)(1) reflects the applicable industry standard is disputed. According to Defendant's expert, the ASME standard governing guarding for conveyors provides for more flexibility than the comparable OSHA regulation. (Dkt. 35–2 at 8–11).

■ Usually, when there is a factual question about the applicability of two competing industry standards, it is for the fact-finder to determine which standard applies. *Rupolo v. Oshkosh Truck Corp.,* 749 F.Supp.2d at 43. Here, however, the dispute is not between two industry standards, but between a federal safety regulation imposed upon employers and an industry consensus standard. The determination as to whether the OSHA regulation or the ASME standard applies might be a fair task to give the fact-finder had Plaintiff's expert also pointed to some other evidence showing that the OSHA regulation was used by manufacturers as an industry standard at the time of manufacture. This he did not do. Instead, in his Affidavit (Dkt. 35–8 at 82), Mr. Coniglio blithely cited Defendant's violation of the OSHA regulation without anchoring it to any indication that the regulation accurately reflects the industry standard that existed at the time of manufacture.[9]

---

**8.** *See also Aerospace Testing Alliance v. Occupational Safety & Health Review Comm'n,* 371 Fed.Appx. 568, 573 (6th Cir.2010) (discussing material differences between an industry standard and the applicable OSHA guarding requirement in that case and noting that employer's compliance with the industry standard did not shield the employer from compliance with the OSHA regulation).

**9.** Despite the absence of any evidence showing that the applicable OSHA regulation in this case was the industry standard, the Court has carefully considered whether, nonetheless, the use of OSHA regulations is appropriate here because the product at issue was designed for industrial use by employees rather than the general public. At least according to one district court, "a product [designed for industrial use] that falls below the standard of

Plaintiff has not offered any evidence whatsoever from which a jury could reasonably conclude that the OSHA regulation upon which Mr. Coniglio relied was the industry standard that existed at the time of manufacture, and the Court is unwilling to base its reliability analysis on either the assumption that the industrial manufacturing industry automatically adopts as industry standards the federal regulations applicable to the workplace or the assumption that the federal regulations in force at any particular time always reflect the industry standards applicable to the manufacturing industry. Accordingly, the Court concludes that Mr. Coniglio's methodology insofar as he relied upon OSHA regulations is not reliable.

## 2. Mr. Coniglio's Methodology Relying upon ASME Standards is Reliable in Part and Unreliable in Part.

■ Mr. Coniglio also bases his opinion on Defendant's alleged violations of ASME B20.1–2003, which contains safety standards for conveyors. Defendant's expert concedes that ASME B20.1–2003 is the applicable industry consensus standard. (Dkt. 35–2 at ¶ 20). For the reasons stated below, the Court concludes that Mr. Coniglio's methodology underlying his conclusion that Defendant violated the ASME standards governing proper guarding is reliable and admissible, but that his methodology supporting his conclusion that Defendant violated the ASME standards governing emergency stops is not reliable and is inadmissible.

### a. Improper Guarding Under ASME Standards

The ASME safety standards provide the following best practices concerning the guarding of conveyors in general, in relevant part:

5.9.1.1 Guarding. Where necessary for the protection of personnel from hazards, all exposed moving machinery parts that present a hazard to personnel at work stations or operator's stations shall be mechanically or electrically

care applicable to employers would be virtually useless, as the market for that product is made up almost entirely of employers purchasing equipment for use by their employees." *See Medley v. Freightliner LLC*, No. CIV. 07–1580(DRD), 2009 WL 1562239, at *5 (D.N.J. June 2, 2009) ("While th[e] [OSHA] standards are addressed to the duty of care owed to employees by their employers, 29 U.S.C. § 654, they nevertheless may serve as evidence of the reasonableness of a design in a case brought directly against the manufacturer of an allegedly-defective product."); *see also McKinnon v. Skil Corp.*, 638 F.2d 270, 275 (1st Cir.1981) ("Our ruling approving the exclusion of this OSHA regulation is explicitly limited to the particular facts of this case: admission on behalf of a consumer-plaintiff to establish the manufacturer-defendant's standard of care in a product liability case concerning a product designed for consumer, not industrial, use. We express no opinion as to whether OSHA regulations and compliance therewith would be admissible in an action where the defendant is a manufacturer of industrial machines.").

The Court rejects the theory that the requirements imposed by OSHA regulations necessarily and inevitably become industry standards applicable to manufacturers based on the theory that manufacturers, at least to be successful in the marketplace, must produce products that meet their customers' needs (and their customers are employers subject to OSHA regulations). First, simply because employers are subject to OSHA regulations does not mean that they require their manufacturers to make OSHA-compliant products. Some employers choose to make OSHA-compliant modifications after the sale on their own (as allegedly occurred in this case). Second, the Court cannot assume that manufacturers voluntarily assume the responsibility of making OSHA-compliant products, especially where the industry standard might be less onerous than the OSHA regulation. The Court cannot believe that a methodology built upon such questionable assumptions could be considered reliable under *Daubert*.

guarded, or guarded by location or position.

. . . .

5.9.2 Guarding by [L]ocation or Position[.] (a) Remoteness from frequent presence of public or employed personnel shall constitute guarding by location.

. . . .

5.9.3. Guarding of Nip and Shear Points. In general, nip and shear points shall be guarded unless other means to assure safety are provided.

ASME B20.1–2003, Safety Standard for Conveyors and Related Equipment, ¶ 5.9.1.1, ¶ 5.9.2(a), ¶ 5.9.3.

In his Affidavit filed with the Court, Mr. Coniglio opined that Defendant violated the above-quoted ASME standards by manufacturing an unguarded Conveyor with "nip points." (Dkt. 35–8 at 82–94). Although, in his Affidavit filed with the Court, Mr. Coniglio failed to address whether the Conveyor was guarded by location under ASME B20.1–2003, ¶ 5.9.2,[10] during his deposition, Mr. Coniglio opined that the Conveyor was not guarded by location because there were no barricades or any other barriers precluding the presence of employed personnel in the area. (Dkt. 35–8 at 36, Coniglio Dep.). Mr. Coniglio disagreed with Defendant that Brunner's alleged instruction to stay out of the hazard area was sufficient to guard by location. (*Id.* at 36–37). Because Mr.

Coniglio's methodology was properly supported by application of a recognized industry standard (that existed at the time of manufacture) to the facts of the case, the Court concludes that Mr. Coniglio's methodology was reliable insofar as he relied upon ASME standards governing the guarding of conveyors.[11]

### b. Inadequate E–Stops under ASME Standards

 The ASME safety standards provide the following best practices concerning the use of emergency stop devices for conveyors, in relevant part:

All such emergency stop devices shall be easily identifiable in the immediate vicinity of such locations unless guarded by location, position, or guards. Where the design, function, and operation of such conveyor clearly is not hazardous to personnel, an emergency stop device is not required.

ASME B20.1–2003, 5.11(c)(1).

Plaintiff's expert opined that there were inadequate Emergency "E" Stops on the Inspection System in violation of ASME B20.1–2003, 5.11(c)(1). Defendant challenges the reliability of Mr. Coniglio's opinion because Mr. Coniglio could not accurately identify Plaintiff's exact location at the time of the accident and thus could not accurately assess the nearest E–Stops relative to Plaintiff's location. (Dkt. 35–3

---

**10.** While Defendant has not specifically challenged Mr. Coniglio's opinion to the extent it is based upon ASME standards, the Court notes that Mr. Coniglio's opinion, at least as presented in his Affidavit filed with the Court, was conclusory in nature. (Dkt. 35–8 at 80–96). Nevertheless, Mr. Coniglio supplied the missing detail in his deposition testimony. (Dkt. 35–8). In addition, while there was some confusion in the record about Plaintiff's precise location at the time of the accident, Mr. Coniglio testified that the accident would have occurred due to the absence of guarding without regard to what side of the Conveyor Plaintiff was standing. (Dkt. 35–8 at 42, Con-

iglio Dep.). Specifically, Mr. Coniglio stated, "I want to be clear about something. Based upon my review of this, without that guarding on there, whether he was on the inside or the outside, the same accident could have occurred." (*Id.*).

**11.** For the same reasons, the Court concludes that Mr. Coniglio's reliance upon ASME B20.1–2003, 6.7, which specifically governs guarding for live rollers conveyors is reliable. Again, Defendant did not specifically object to Mr. Coniglio's reliance upon ASME standards.

at 9; Dkt. 35–8 at 64–65). In addition, Defendant argues that Mr. Coniglio did not measure the distance between Plaintiff's alleged location and the nearest E–Stop. (Dkt. 35–3 at 10).

The undisputed record shows that Mr. Coniglio did not observe any E–Stops on the side of the Conveyor where the gravity conveyors received the brake shoes coming from the main Conveyor. (Dkt. 35–8 at 41, Coniglio Dep.). However, it is undisputed by both parties that Plaintiff was standing on the Left Side of the Conveyor, not the side where the gravity conveyors are located, and it appears that Mr. Coniglio conceded that there were some E–Stops on the Left Side of the unit. (Dkt. 35–4 at ¶ 27; Dkt. 42 at ¶ 27). The record also shows that Mr. Coniglio did not take any measurements concerning the location of E–Stops. (Dkt. 35–8 at 55, Coniglio Dep.).

Due to the fact that Mr. Coniglio did not have accurate information regarding Plaintiff's location on the Conveyor relative to the nearest E–Stops, the Court finds that Mr. Coniglio did not reliably assess the accessibility and proximity of the nearest E–Stops on the Conveyor. Accordingly, the Court concludes that Mr. Coniglio's opinion on the adequacy of E–Stops on the Conveyor is inadmissible.

### 3. Mr. Coniglio's Reliance upon CEMA Labeling Standards is Not a Reliable Methodology.

██ Mr. Coniglio relied upon a Conveyor Equipment Manufacturer Association ("CEMA") document entitled "Safety Label Brochure" No. 201, Second Edition (2006). (Dkt. 35–8 at 82, 94). It is undisputed that the Safety Label Brochure was issued after the time the Inspection System was manufactured. Because there is no evidence that the Safety Label Brochure reflected the industry standard at the time of manufacture, the Court concludes that Mr. Coniglio's reliance thereupon was not reliable.[12]

Accordingly, given the present state of the record, the testimony of Plaintiff's expert, Mr. Coniglio, is excluded to the extent he purports to rely upon OSHA regulations, ASME industry standards governing emergency-stop devices, and the 2006 CEMA document. Plaintiff's motion to exclude Mr. Coniglio's testimony is otherwise denied.

### III. Defendant's Motion for Summary Judgment

#### A. Strict Liability

##### 1. Manner of Use

██ Under New York law, in order to have a product liability claim, at the time of injury "the product must have been used for the purpose and in the manner normally intended or in a manner reasonably foreseeable." *Amatulli by Amatulli v. Delhi Const. Corp.*, 77 N.Y.2d 525, 532, 569 N.Y.S.2d 337, 571 N.E.2d 645 (1991). "[T]he foreseeability of the misuse of a product is relevant to the issue of whether the manufacturer adequately designed the product to guard against the risk. . . ." *Del Cid v. Beloit Corp.*, 901 F.Supp. 539, 544 (E.D.N.Y.1995), *aff'd,* 101 F.3d 1393 (2d Cir.1996).

---

**12.** Defendant has not specifically challenged Mr. Coniglio's qualifications insofar as they relate to his ability to offer a labeling opinion or his reliance on his general experience and background in rendering an opinion on labeling. Defendant's challenges were more specifically directed at Mr. Coniglio's qualifications to give an opinion on the design defect claim. Therefore, the Court does not reach the issue of Mr. Coniglio's qualifications or methodology (other than the outdated CEMA bulletin, which was challenged by Defendant) to render an opinion about the labeling on the pushers.

Defendant argues that Plaintiff was not using the Inspection System in the manner normally intended. (Dkt. 35–3 at 12–15). Specifically, Defendant argues that it was not intended that Plaintiff would be working on the Left Side of the Inspection System because neither Plaintiff's employer's safety policy nor its staffing needs contemplated workers there. Plaintiff responds that the manner of Plaintiff's use of the machinery was entirely foreseeable. (Dkt. 38 at 13–14). Plaintiff argues that it was foreseeable that employees would work on the Left Side of the Conveyor because flipped brake shoes were a known problem, which could be fixed on the Left Side, and there was no actual barrier preventing an employee from working on the Left Side of the Conveyor to correct the problem.

### a. The Record Contains Evidence of Unintended But Foreseeable Use.

The Court finds that there is evidence in the record from which a jury could reasonably conclude that Plaintiff's manner of reaching over from the Left Side of the Conveyor to pick up a brake shoe that had fallen over and getting his glove pinched by the moving parts on the Conveyor was foreseeable. The undisputed evidence in the record shows that there was a known problem with brake shoes flipping over at the point where the shoes left the Conveyor and moved to the gravity conveyors. Defendant's representative, Pascal Cormier, conceded as much when he testified during his deposition that it was possible that brake shoes would flip over due to "bad adjustment." (Dkt. 33–5 at 55–56, Cormier Dep.).

There is also undisputed evidence in the record that when a brake shoe flipped over and did not proceed down the production line, it was not an inconsequential occurrence. Rather, a single flipped brake shoe prevented subsequent shoes from moving forward, thereby interrupting the cycle time for the Inspection System, which, in turn, created a backlog on the E–Coat line. (Dkt. 33–1 at ¶ 23; Dkt. 37–2 at ¶ 23).

Due to the problem of flipped brake shoes, it was part of the normal and expected activity of certain users of the Inspection System to pick up and move brake shoes that had flipped over onto the gravity conveyors. Specifically, the stackers performed that function on the opposite (and allegedly safer) side of the Conveyor. Yet, the evidence demonstrates that workers could and did access the flippoint and correct the time sensitive problem by reaching their arm across the Conveyor from the Left Side of the Conveyor, just as Plaintiff did in this case. (Dkt. 33–14 at 10, 18, Palone Dep.). Furthermore, at the time Defendant sold the Inspection System to Plaintiff's employer, Defendant was aware that there were "pinch points" and moving parts on the main Conveyor, and that those pinch points were within reach of a person who attempted to straighten a fallen brake shoe. (Dkt. 33–1 at ¶ 37; Dkt. 37–2 at ¶ 37; Dkt. 33–5 at 90, Cormier Dep.).

Given the record, the Court concludes that there is sufficient evidence for a reasonable jury to conclude that Plaintiffs use of the machinery was reasonably foreseeable.

### b. Defendant's Arguments Do Not Establish Unforeseeable Use as a Matter of Law.

Defendant's arguments in support of its contention that Plaintiff's manner of use was unforeseeable as a matter of law—that Plaintiff failed to follow his employer's safety policies by standing on the Left Side of the Conveyor and that there was no need for any employees working on the Left Side of the Conveyor—are based upon disputed facts and are red herrings.

## 1. Plaintiff's Failure to Follow Employer's Safety Policy

The issue of whether Plaintiff's employer had any kind of a safety policy in place that would have prevented employees from working on the Left Side of the Conveyor is disputed. Mr. Wagner, a manufacturing engineer at Brunner, testified at his deposition that he was not aware of any safety issues with having employees work on the Left Side of the Inspection System and that he did not know of any safety policy prohibiting employees from passing underneath or through moving conveyor lines. (Dkt. 33–15 at 20–21).[13] Furthermore, even if Plaintiff's employer had a safety policy preventing employees from accessing the Left Side of the Conveyor from the E–Coat line, it is unclear why that policy would make Plaintiff's manner of use unforeseeable as a matter of law since Plaintiff testified at his deposition that he was able to access the Left Side of the Conveyor on the date of the accident by walking all the way around the Conveyor, thereby avoiding the E–Coat line. (Dkt. 33–16 at 16, Almonte Dep.).

■■■■ Aside from the factual disputes surrounding Plaintiff's employer's alleged safety policy, the Court questions whether a worker's failure to follow his employer's safety policy can relieve the manufacturer of its duty to design a safe product from the outset "as of the time the product leaves the manufacturer's hands." *Hoover v. New Holland N. Am., Inc.*, 23 N.Y.3d 41, 54, 988 N.Y.S.2d 543 (2014) ("[T]he manufacturer is under a nondelegable duty to design and produce a product that is not defective ... as of the time the product leaves the manufacturer's hands." (internal citations and quotation marks omitted)). At a minimum, an employee's decision to contravene an employer's safety policy does not establish unforeseeable misuse as a matter of law. *See Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.*, 594 F.Supp.2d 230, 245 (N.D.N.Y.2009) (holding that employee's alleged misuse of machinery when he ignored his employer's policies to use safety tether and wear safety harness offered by manufacturer did not constitute unforeseeable misuse as a matter of law).

## 2. The Lack of any Need for Employees on the Left Side of the Conveyor

Defendant contends that Plaintiff's manner of use was unforeseeable because there was no need for any employees to be working on the Left Side of the Conveyor. The record contains conflicting evidence on the issue of whether employees worked on the Left Side of the Conveyor. Plaintiff testified at his deposition that his supervisor had actually stationed him to work on the Left Side of the Conveyor on the date

**13.** To be clear, there is no evidence in the record that Defendant delivered the Inspection System with any explicit instructions or any warnings requiring the user to stay away from the pusher-side of the Conveyor, nor is there any evidence that Defendant had a clear expectation or understanding that its customer (Plaintiff's employer) would assume responsibility specifically for keeping employees away from the dangerous area. *See Amatulli by Amatulli v. Delhi Const. Corp.*, 77 N.Y.2d 525, 532–33, 569 N.Y.S.2d 337, 571 N.E.2d 645 (1991) (holding that a pool manufacturer was not held liable for injuries sustained when a plaintiff dove headfirst into a shallow above-ground pool where the manufacturer provided explicit instructions requiring above-ground installation but the user installed the pool in the ground thereby obscuring the shallow nature of the pool's depth). Indeed, Defendant's representative, Pascal Cormier, who worked on the design and distribution of the Inspection System for Plaintiff's employer, testified at his deposition that Plaintiffs employer never expressed to him that employees were not allowed in the area between the E–Coat line and the Left Side of the Conveyor. (Dkt. 33–5 at 139, Cormier Dep.).

of the incident to correct any brake shoes that had flipped over. (Dkt. 33–16 at 15, 17, Almonte Dep.). Further, Plaintiff's supervisor testified that he had observed people from time to time manually flip brake shoes over from the Left Side of the Conveyor while the Conveyor was moving. (Dkt. 33–14 at 10, 18, Palone Dep.). Mr. Palone testified that he had even observed Defendant's representative doing so. Hence, even if neither Plaintiff's employer nor Defendant anticipated any employees regularly working on the Left Side of the Conveyor, that does not address the issue of whether it was foreseeable that from time to time, particularly when smaller brake shoes were being processed, an employee would seek to correct the flipped brake shoes from the Left Side of the Conveyor.

Moreover, as noted above, there is no evidence that at the time the Inspection System left Defendant's hands, there were any discussions between Defendant and Brunner regarding the presence of workers on the Left Side. There is no evidence in the record that Defendant specifically instructed Plaintiff's employer that employees should not be stationed on the Left Side of the Conveyor, or that Plaintiff's employer gave Defendant assurances that its staffing plan for the Inspection System did not include the presence of employees there. As a result, the Court cannot conclude that as a matter of law it was not foreseeable that Plaintiff would work on the Left Side of the Conveyor where his injury occurred.[14]

Given the conflicting testimony in the record, the Court cannot conclude that

Plaintiff's use of the machinery was somehow unforeseeable as a matter of law.

### 3. Product Defect

### a. Design Defect

To show that a product was defectively designed, a plaintiff must show that it was feasible to design the product in a safer manner. *Colon*, 199 F.Supp.2d 53 at 83. Defendant claims that without expert testimony regarding the feasibility of an alternative design, Plaintiff cannot prove his case. (Dkt. 35–3 at 15). Plaintiff counters by arguing that after the accident, Plaintiff's employer installed metal guards on the machine, which raises an issue of fact as to the element of a feasible alternative design. (Dkt. 38 at 15–20).

"To recover under a theory of strict products liability for sale of a defectively designed product, it is well established that a plaintiff must plead and prove that there was a feasible design alternative that would have made the product safer." *In re Fosamax Prods. Liab. Litig.*, 924 F.Supp.2d 477, 485 (S.D.N.Y.2013) (quotation omitted). "Courts in this Circuit have consistently held that in a strict products liability case based upon an allegation of defective design, expert testimony alleging the existence of a reasonable alternative design must almost always either (1) point to the existence of such a design in the marketplace, or (2) test, or at least design in detail, a product incorporating the suggested modifications." *Adeyinka v. Yankee Fiber Control, Inc.*, No. 05 CIV.0751 RJS, 2009 WL 3154319, at *2 (S.D.N.Y. Sept. 23, 2009).

Some courts, including a district court in this circuit, have held that a plain-

---

**14.** The foreseeability of the presence of employees working on the Left Side of the Conveyor is further evidenced by the fact that there were warning labels affixed to the pushers on the Left Side of the Conveyor. *See Del Cid v. Beloit Corp.*, 901 F.Supp. 539, 550

(E.D.N.Y.1995) ("If there were any doubt on the issue of the foreseeability of this accident, it was eliminated by Beloit's providing a specific warning against standing on the machine during its operation."), *aff'd*, 101 F.3d 1393 (2d Cir.1996).

tiff can demonstrate feasibility of an alternative design in support of a design defect claim under New York law by showing that the plaintiff's employer, after the accident, successfully made modifications to the product in question to make it safer. *See Seeley v. FKI Logistex*, No. 6:07–CV–381–DNH–DEP, 2009 WL 2871170, at *3 (N.D.N.Y. Sept. 3, 2009) ("Wal–Mart's maintenance supervisor, Kevin Behr, testified that the emergency stop cord was extended after plaintiff's accident and identified the work order recording the change. With this testimony, plaintiff demonstrates a feasible alternative design for the emergency cord." (citations omitted)); *see also Legari v. Lawson Co.*, 189 A.D.2d 1089, 1092, 593 N.Y.S.2d 336 (3d Dep't 1993) ("It was undisputed that, after this accident, the machine's hand-operated buttons were modified so that it became necessary to keep both hands on the buttons to continue operation of the machine, demonstrating the feasibility of a safer

design. Thus, there clearly were outstanding triable issues as to the claimed design defects." (citation omitted)).[15]

▇▇▇ The Court agrees that the existence of a feasible alternative design may be established by pointing to the existence of a post-accident design at the plaintiffs workplace. *Seeley*, 2009 WL 2871170, at *3. In this case, Plaintiff presented evidence of feasibility by the fact that Plaintiff's employer, Brunner, installed and utilized a safety guard on the Conveyor in response to Plaintiff's injury. (Dkt. 33–7).[16] Furthermore, Plaintiff's expert testified that the new guard installed by Plaintiff's employer on the Inspection System made the Conveyor safer.[17] (Dkt. 35–8 at 45, Coniglio Dep.).

Defendant argues that Plaintiff's own expert testified that the safety guard that Plaintiff's employer installed on the Inspection System "actually is unsafe" (Dkt. 41 at 7), but that is a mischaracterization of Plaintiff's expert testimony.[18] Despite persistent questioning, Plaintiffs expert

---

**15.** Since the modification was made by a non-defendant and/or the modification relates to the feasibility of a guard, which is a disputed issue, Rule 407 of the Federal Rules of Evidence does not bar the evidence. *See Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 583–84 (5th Cir.1985).

**16.** There is no evidence that the new guarding negatively impacted the effectiveness of the Inspection System. Furthermore, as evident by Brunner's installation of the new guard, the new guard installed by Plaintiffs employer was not cost-prohibitive; indeed, Plaintiff's expert estimated that it did not cost much more than a couple thousand dollars. (Dkt. 35–8 at 76–77, Coniglio Dep.).

**17.** Because Plaintiff's expert opined that the new guard made the Conveyor safer, *see In re Fosamax Prods. Liab. Litig.*, 924 F.Supp.2d 477, 485 (S.D.N.Y.2013), which thereby raises an issue of fact as to the feasibility of a safer alternative design for trial, the Court need not consider the more difficult issue of whether a post-accident design installed and utilized by the plaintiff's employer is alone, without the

aid of expert testimony, sufficient to carry a plaintiff's burden of proof.

**18.** It has not been lost on the Court that Defendant is essentially arguing that while, in Defendant's view, Plaintiff's expert is not qualified to offer opinions on defects in the original design of the Inspection System to support Plaintiff's own case because he has never designed any mechanical equipment and is not licensed as a mechanical engineer (Dkt. 35–3 at 7), Plaintiff's expert is apparently abundantly qualified to offer his opinion on the inadequacy of the design of the new guarding in support of Defendant's position that the design of the new guarding is unsafe (Dkt. 41 at 7). The Court also finds it peculiar that Defendant cites favorably to Plaintiff's expert's testimony given that Plaintiff's expert opined that the alternative design was incomplete only because *more* guarding was needed, yet Defendant maintains that the original design, which had no guarding at all, was sufficient.

maintained throughout his deposition that the new guarding was not unsafe. (Dkt. 35–8 at 45, Coniglio Dep. ("I know that in reading your expert's report, he feels that the guarding put on offers a hazard, which I don't see, by the way."); *id.* at 48 ("I would not say that the cage itself poses a hazard."); *id.* at 49 ("So I believe this needs more work, but I do not believe the guard itself poses a hazard."); *id.* at 50 ("The guard itself is not causing the hazard. The guard is not going to hurt the person."); *id.* at 51 ("I'm going to refer to your expert's report—that putting this guard on here is a problem and we shouldn't have a guard, I disagree with that wholly.")).

On the contrary, there is evidence in the record that Plaintiff's expert believed that the guarding installed by Plaintiff's employer made the machine safer in that having the new guard was preferable to having no guard at all, as indicated in his deposition:

> Q. Do you have an alternative design? And by that I mean, do you have a suggestion for what kind of guarding should have been put on it?
>
> A. Actually, there's multiple ways. I know that in reading your expert's report, he feels that the guarding put on offers a hazard, which I don't see, by the way. But there are numerous ways. Putting a fixed guarding on it as you have now and is shown in the photographs prevents somebody from getting in the conveyor area and keeps them from some distance getting near the ram, although, not totally away from the ram. You could still reach across and be hit by the ram coming forward, but it's not the same as being drawn into it.

(*Id.* at 45). It is true that Plaintiff's expert believed that more guarding was needed because a potential hazard still existed and therefore that the new guarding was incomplete. (*Id.* at 45, 50). Yet,

Plaintiff's expert opined that the *new* guarding installed by Plaintiff's employer "keeps [workers] from some distance getting near the ram" and "it's not the same as being drawn into [the ram]." (*Id.* at 45). Defendant's challenges to Mr. Coniglio's opinion on the issue of whether the new guard installed by Plaintiffs employer makes the Conveyor safer go to the weight of Mr. Coniglio's testimony and may be explored on cross-examination at trial.

At this juncture, based upon the evidence in the record, the Court finds that Plaintiff has adequately supported his design defect claim with sufficient evidence of a feasible alternative design that improved overall safety to raise questions of fact for submission to a jury.

### b. Failure to Warn

■■■■■ "Liability for failure to warn may be imposed 'based upon either the complete failure to warn of a particular hazard or the inclusion of warnings that are insufficient.'" *Fisher v. Multiquip, Inc.*, 96 A.D.3d 1190, 1192, 949 N.Y.S.2d 214 (3d Dep't 2012) (quoting *DiMura v. City of Albany*, 239 A.D.2d 828, 829, 657 N.Y.S.2d 844 (3d Dep't 1997)). "An adequate warning or instruction is one that is understandable in content and conveys a fair indication of the nature and extent of the danger to a reasonably prudent person." *Cooley v. Carter–Wallace, Inc.*, 102 A.D.2d 642, 646, 478 N.Y.S.2d 375 (4th Dep't 1984). "Generally, whether a warning is adequate is an issue of fact to be determined at trial." *Figueroa v. Boston Scientific Corp.*, 254 F.Supp.2d 361, 370 (S.D.N.Y.2003).

■■■ Defendant maintains that the decals that were affixed to the pushers were conspicuous and easy to see and fairly warned against crushing injuries similar to the one sustained by Plaintiff. (Dkt. 35–3 at 19–20; Dkt. 37–1 at 4–5). In addition, Defendant contends that Plaintiff would not have read some other warning because

he cannot read English. (Dkt. 37–1 at 7). Plaintiff argues that the issue of whether the decals were conspicuous or easy to see is a factual issue, as is the proximity of the decal closest to Plaintiff at the time of the accident, and that a reasonable person would not have understood them as warning against reaching across the Conveyor and having one's gloved hand dragged in front of the pusher machine. (Dkt. 42 at ¶¶ 53–54). Plaintiff contends that his alleged failure to speak/read English well does not obviate the need for adequate warnings. (Dkt. 40 at 4).

Defendant has provided the Court with a picture of the warning decal on the Inspection System. (Dkt. 35–12). The Court cannot conclude, based upon this image, that the warning was adequate as a matter of law. *Duval v. Delta Int'l Mach. Corp.*, No. 1:13–CV–4270–GHW, 2015 WL 4522911, at *7 (S.D.N.Y. July 27, 2015) ("[T]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." (citation omitted)). As the New York Court of Appeals has held:

> The nature of the warning to be given and to whom it should be given likewise turn upon a number of factors, including the harm that may result from use of the product without notice, the reliability and any possible adverse interest of the person, if other than the user, to whom notice is given, the burden on the manufacturer or vendor involved in locating the persons to whom notice is required to be given, the attention which it can be expected a notice in the form given will receive from the recipient, the kind of product involved and the number manufactured or sold, and the steps tak-

en, other than the giving of notice, to correct the problem. . . . Generally, the issue will be one of fact for the jury whose function will be to assess the reasonableness of the steps taken by the manufacturer or vendor in light of the evidence concerning the factors listed above presented in the particular case, as well as any expert testimony adduced on the question.

*Cover v. Cohen*, 61 N.Y.2d 261, 276–77, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984) (internal citations omitted). Here, the reasonableness of the steps taken by Defendant in light of the evidence concerning these factors is an issue of fact for the jury to assess.

In addition, the mere fact that Plaintiff might not read English, which incidentally is not conclusively established by the present record, does not warrant summary judgment in Defendant's favor. Plaintiff's failure to read English may raise factual issues of its own, such as whether the word "Danger" should have also been written in Spanish, *Arbaiza v. Delta Int'l Mach. Corp.*, No. 96–1224, 1998 WL 846773, at *7 (E.D.N.Y. Oct. 5, 1998) (finding Spanish-speaking plaintiff who admittedly did not read warnings raised an issue of fact whether the warning was inadequate because, among other things, it was in English only), and whether fellow employees might have conveyed the meaning of the warning to Plaintiff, *Sorto–Romero v. Delta Int'l Mach. Corp.*, No. 05–CV–5172 SJF AKT, 2007 WL 2816191, at *12 (E.D.N.Y. Sept. 24, 2007) ("[I]n light of Plaintiff's inability to read the warnings, Plaintiff may be able to prove causation whereby a third party may have conveyed the warning to him." (citing New York case law)).[19]

---

19. Although not dispositive, the Court notes that Plaintiffs employer's Accident and Investigation Report is written in English but signed by Plaintiff. (Dkt. 33–7). The Court questions whether the information in the Report was relayed to Plaintiff before he signed the Report.

In summary, the mere existence of the warnings themselves is an insufficient basis for the Court to decide, as a matter of law, that Defendant is not liable for a failure to warn. It is for the jury to decide, taking into account all the relevant circumstances, whether the warnings provided by Defendant were adequate.

### c. Manufacturing Defect

 "In claims involving manufacturing defects, a consumer may reasonably expect a product to be made in accordance with the manufacturer's standards and expect to be compensated for injuries resulting from the manufacturer's failure to meet them. The product is reasonably held defective because the manufacturer has not made the product as it intended." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 270, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995). Defendant contends that there is no evidence in the record before the Court that the Inspection System deviated in any way from the manufacturer's standards. Plaintiff seemingly concedes this point, having offered no argument in opposition to Defendant's motion for summary judgment as to this point. Because Plaintiff has failed to come forward with evidence of a manufacturing defect, the Court concludes that summary judgment in favor of Defendant on the manufacturing defect claim is warranted.[20]

### B. Breach of Implied Warranty

 Defendant argues that it is entitled to summary judgment on Plaintiff's claim for breach of implied warranty because the claim is barred by the statute of limitations. (Dkt. 35–3 at 21). Defendant's argument is well-taken. "The statute of limitations for . . . a cause of action [for breach of implied warranty] against a manufacturer or distributor is four years and accrues on the date the party charged tenders delivery of the product." *Bristol Vill., Inc. v. Louisiana–Pac. Corp.*, 916 F.Supp.2d 357, 364 (W.D.N.Y.2013) (quotation omitted). In this case, it is undisputed that the Inspection System was delivered to Brunner in August 2004. This action was not commenced until March 18, 2011 (Dkt. 1 at ¶ 1), far outside the four year limitations period. Therefore, the Court grants Defendant's motion for summary judgment on the breach of implied warranty claim.

### C. Breach of Express Warranty

 The sole basis for Defendant's motion for summary judgment on Plaintiff's breach of express warranty claim is that Plaintiff was not a party to the sales contract regarding the Inspection System and thus cannot have relied on any express warranty in deciding to purchase the Inspection System. (Dkt. 35–3 at 22).

---

20. The Court concludes that summary judgment in Defendant's favor on Plaintiff's negligence claim is denied for the same reasons that summary judgment is denied on Plaintiff's strict liability claim, with the exception that summary judgment is granted to the extent the negligence and strict products liability claims are based upon a manufacturing defect. As stated by a district court in this circuit:

New York courts generally consider strict products liability and negligence claims to be functionally synonymous. Although the Second Circuit has characterized this as-

pect of New York products liability as unsettled because the New York Court of Appeals has yet to affirmatively hold that negligence and strict liability have merged, New York courts have treated the differences between negligence and strict liability as inconsequential.

*Cavanagh v. Ford Motor Co.*, No. 13–CV–4584 JS WDW, 2014 WL 2048571, at *5 (E.D.N.Y. May 19, 2014) (citations and internal quotation marks omitted) (dismissing negligence claim for the same reasons that the strict products liability claims were dismissed).

Defendant's argument ignores the well-established "personal injury" exception to the normal requirements of a claim for breach of express warranty, aptly explained as follows:

> Privity is normally an essential element of a cause of action for express warranty, but the U.C.C. includes a personal injury exception: A seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.

*DiBartolo v. Abbott Labs.*, 914 F.Supp.2d 601, 624–25 (S.D.N.Y.2012) (quotations and citations omitted); *see also Koenig v. Boulder Brands, Inc.*, 995 F.Supp.2d 274, 290 (S.D.N.Y.2014) ("[U]nder New York law, privity is an essential element of a cause of action for breach of express warranty, unless the plaintiff claims to have been personally injured."). Because there is evidence in the record that Plaintiff was personally injured, the exception to the privity requirement applies.[21] Accordingly, Defendant's motion for summary judgment as to the breach of express warranty claims is denied.

**21.** At oral argument on the summary judgment motion, Defendant's counsel argued as an alternative ground that the record does not contain any evidence that Defendant made any warranties. Because the issue was not raised in Defendant's papers submitted in support of its motion for summary judgment (Dkt. 35–3), the Court concludes that Defendant has waived that argument for purposes of the motion for summary judgment.

**22.** A successor corporation can be held liable for the conduct of its predecessor based upon one of the following circumstances: (1) Defendant expressly or impliedly assumed the predecessor's tort liability; (2) there was a consolidation or merger of seller and Defendant; (3) Defendant was a mere continuation

## IV. Plaintiffs Motion for Summary Judgment

▬▬▬ Plaintiff seeks to hold Defendant liable for the conduct of its predecessor[22] and for Defendant's own conduct. Plaintiff's motion for summary judgment is directed to the latter basis.[23] Defendant purchased the company that originally manufactured and installed the Inspection System on April 1, 2005. (Dkt. 33–2 at 5). According to Plaintiff, Defendant updated the Inspection System in 2005, performed service and maintenance on the Inspection System, and entered into written service contracts for the Inspection System. (*Id.* at 6). Plaintiff contends that as a result, Defendant is independently liable, as a matter of law, for its failure to warn of the dangerous condition of the unguarded Conveyor.

▬▬▬ Under New York's general tort rules, under certain circumstances, a person may be found negligent because he or she fails to warn another of known dangers or, in some cases, of those dangers which he had reason to know. *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 246, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983). The duty commonly is imposed because of some special relationship, frequently economic. *Id.* Where a special

of the selling corporation; or (4) the purchase/sale transaction was entered into fraudulently to escape liability. *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 245, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983).

**23.** Defendant contends that Plaintiff's failure to move for summary judgment on certain claims amounts to an abandonment of those claims. That argument is baseless. Just as Defendant's failure to premise its summary judgment motion on the absence of successor liability does not amount to a concession that Defendant is liable as a successor corporation, Plaintiff's decision not to move for summary judgment on certain claims is not a waiver or abandonment of those claims.

relationship exists between a successor corporation and the customers of the predecessor involving "actual or potential economic advantage to the defendant successor corporation," the law imposes on the successor corporation an independent duty to warn the pre-existing customer (and its employees) of such dangers. *Id.* The following factors may be considered in determining whether there exists a sufficient link to create a duty to warn: "[s]uccession to a predecessor's service contracts, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, [and] a purchaser corporation's knowledge of defects and of the location or owner of that machine." *Id.*

As discussed above, there are genuine issues of material fact as to whether Defendant in fact failed to warn of dangers or defects associated with the Inspection System. As such, the Court need not reach the separate issue of whether a special relationship existed between Defendant and Plaintiffs employer involving economic advantage so as to impose upon Defendant an independent duty to warn, since to do so would amount to a mere advisory opinion. For these reasons, Plaintiff is not entitled to summary judgment on the failure to warn claim.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 35) is granted in part, insofar as Defendant seeks summary judgment on Plaintiff's breach of implied warranty claim (second cause of action), and on Plaintiff's negligence (first cause of action) and strict products liability (third cause of action) claims but only to the extent they are based upon a manufacturing defect. Defendant's motion for summary judgment is otherwise denied, and Plaintiff's motion for summary judgment (Dkt. 33) is denied. Defendant's motion to exclude the testimony (Dkt. 35-3 at 4) of Plaintiffs expert, John Coniglio, is granted in part, but only insofar as Defendant challenges Plaintiff's expert's reliance upon OSHA regulations, ASME industry standards governing emergency-stop devices, and the CEMA document entitled "Safety Label Brochure," No. 201, Second Edition (2006). Defendant's motion to exclude is otherwise denied.

SO ORDERED.